**IPSCO, INC. and Ipsco Steel, Inc., Plaintiffs,**

**and**

**The Algoma Steel Corporation, Ltd.,**

**and**

**Sonco Steel Tube Div., Ferrum, Inc., Plaintiff–Intervenors,**

**v.**

**The UNITED STATES, Defendant,**

**and**

**Lone Star Steel Company, Defendant–Intervenor.**

**Court No. 86–06–00753.**

United States Court of International Trade.

Oct. 30, 1990.

Barnes, Richardson & Colburn, Rufus E. Jarman, Jr., Josephine N. Belli, New York City, for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Jeanne E. Davidson, Craig L. Jackson, Attorney–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, for defendant.

Dewey, Ballentine, Bushby, Palmer & Wood, Michael H. Stein, Washington, D.C., and Akin, Gump, Strauss, Hauer & Feld, Warren E. Connelly, Valerie A. Slater, Washington, D.C., for defendant-intervenor.

## OPINION

RESTANI, Judge:

This challenge to an original antidumping determination by the Department of Commerce (Commerce or ITA) regarding Canadian oil country tubular goods (OCTG) is before the court following a third remand.

All of the issues discussed here concern proper calculation of constructed value for foreign market value purposes. *See* 19 U.S.C. § 1677b(e) (1988). In *Ipsco, Inc. v. United States*, 12 CIT ——, 687 F.Supp. 633 (1988) (*Ipsco I*) the court addressed several issues including a cost allocation between limited services and prime OCTG and amortization of extraordinary costs of production. Remand on the first issue was ordered. In *Ipsco, Inc. v. United States*, 13 CIT ——, 714 F.Supp. 1211 (1989) (*Ipsco II*) the court remanded the first issue once more but with more specific instructions. Following the second remand the antidumping margin was reduced by 1.15 percent, but Ipsco objected that ITA erred in its recalculation because it did not utilize a full six months of data for a particular grade of OCTG. This issue was quite distinct from

the allocation methodology discussed in *Ipsco I* and *Ipsco II*. Nonetheless, in *Ipsco, Inc. v. United States*, Slip Op. 90–37, at 7, 1990 WL 51968 (April 16, 1990) (*Ipsco III*) the court once more remanded for ITA to determine:

whether it used correct tonnage data and dollar to tonnage ratios and, if not, whether the error occurred in the original determination, whether it was germaine to the original determination, and whether Ipsco could have discovered the problem after the original determination through the exercise of the amount of diligence appropriate under the facts of the case.

In the third remand determination ITA states that due to the passage of time and departure of employees it cannot determine exactly why three months of data were utilized but that it is clear that ITA did use just three months of data for the grade of OCTG at issue. ITA states that because sales did not occur in the following quarter there would have been no need to use data from that quarter and that, in any case, utilization of the second quarter data would raise the margins.

Ipsco responds as follows:

1.  An error did occur because 19 U.S.C. § 1677b(e)(1)(A) requires ITA to examine costs "at a time preceding the date of exportation ..." Ipsco opines that exportation refers to shipment and shipment occurred throughout the six months period.

2.  Although it does not deny that use of only one quarter of data was relevant from the outset, Ipsco alleges that it exercised due diligence in examining the record. It alleges that the error was masked by ITA's limited service, prime misallocation and Ipsco should not be found responsible for discovering this error before the allocation was corrected.

3.  Use of six months of data would not result in a higher margin if ITA were directed to normalize costs for this product as it indicated, in the final determination, would be done.

4. Even without normalization margins would still be lower if ITA treated work-in-process in the same manner for both quarters.

The court turns first to the normalization issue. This is not a new issue in this case. This was a hotly contested issue at the agency level, and plaintiff had some success, that is, it turned ITA's preliminary view around to some extent, as stated in the final determination: [1]

IPSCO incurred abnormally high costs for certain products which it recently started producing. However, the normalized cost data submitted by Ipsco was not sufficiently substantiated. At verification, information was gathered regarding yield rates during and after the period of investigation. Where such information was available, the low yield rates in the period of investigation were normalized, in keeping with the Department's policy of amortizing start-up costs over future production.

*Antidumping; Oil Country Tubular goods From Canada; Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 15029, 15032 (April 22, 1986), *as amended* 51 Fed.Reg. 29579 (Aug. 19, 1986).

The final determination stated further: The normalized cost information submitted by IPSCO is based on standard costs contained in IPSCO's annual management budget adjusted for inflation using a broad index of price levels. The standard costs contained in the budget are not used by IPSCO in its cost accounting system. This information is not sufficient to substantiate the level of production costs under normal operating conditions. However, as stated in our response to Petitioner's Comment 16, we have amortized costs related to low yield rates on initial production runs over present and estimated future production, where yield rates for subsequent production were available and were lower.

*Id.* at 15036.

■ This issue also is not new to the court. It is discussed in *Ipsco I,* 687 F.Supp. at 638–640. Obviously Ipsco knew from both ITA's final determination and its own review of the record that not all products were normalized and it knew enough to argue this point strongly from the beginning. According to Ipsco, with proper normalization of this, its most important limited service product for the period at issue, the margin would be lowered in excess of ten percent. Any argument specific to this grade should have been made in connection with the court's original consideration of this issue. The court found in *Ipsco I* based on the record and argument of counsel that ITA's normalization decisions were correct. 687 F.Supp. at 639–40. Ipsco has presented no adequate reason why all facts relevant to normalization could not have been raised when this issue was before the court. In fact, the court is not aware that there are any particular facts related to this product that were not raised and considered. As far as this court is concerned, this issue has been laid to rest and Ipsco has not met the burden necessary to resurrect it.

Apparently, without normalization, the margin swing would not exceed three percent even under plaintiff's view of work-in-process. Nonetheless three percent may be a significant difference from plaintiff's point of view, thus the issue of three versus six months of data must be addressed.

Even at this late date the parties have not briefed the question of whether ITA erred in using one quarter of data for the grade at issue. Neither side has discussed, in any detail, the relevance of sales versus delivery in regard to of 19 U.S.C. § 1677b(e)(1)(A). Neither has it been demonstrated that delivery data, in addition to sales data, is in the record. These are exactly the types of issues that Ipsco should have discussed with ITA, if Ipsco possessed ITA cost sheets prior to litigation. Assuming *arguendo* that it did not have sufficient information to address this issue prior to litigation, Ipsco could have addressed the issue as soon as it obtained the full record following the commence-

---

1. The court accepts plaintiff's reply brief which addresses this issue in some detail.

**1150**

ment of litigation. ITA's cost sheets seem to indicate exactly the volume of tonnage used by ITA. For this important grade Ipsco can be held responsible for comparing its own submissions to ITA generated data.

Plaintiff asserts, assuming *arguendo* that the "error" was discoverable, that it should not be held to have failed to use due diligence in discovering the error. Plaintiff alleges that ITA's allocation error masked the effect of ITA's data selection. One must recall that both ITA and Ipsco were under misapprehension as to how to allocate properly. The court rejected both views. It was quite possible that any masking was the result of Ipsco's own erroneous methodology.

██ Whatever the source of confusion, the relevant tonnage data was in the original record, it was significant to the outcome of the original determination, it involved an important product, and it could have been found without *unduly* burdening plaintiff. This does not mean that plaintiff could find the error easily or that its discovery involved *no* burden. Examination of the record involves cost and effort, but parties choose how much time and expense they will invest in examining the record and unearthing errors. While plaintiff's actions may be entirely understanda-

ble, they cannot be countenanced. Judicial economy, fairness to the parties and the need to fulfill Congress's intent of prompt resolution of these matters requires that errors of methodology, data selection, calculation, etc. all be raised from the outset, unless some extraordinary factor supports relief at a later date. The court finds no extraordinary factor present here. ITA's error of allocation did not relieve Ipsco of the duty to examine the record for other significant errors. Unless a thorough examination of the record is made prior to briefing, the court and the parties risk becoming involved in unnecessary litigation of unimportant issues.

Because the court declines to decide at this late date whether ITA should have used an additional quarter of data for the grade of OCTG at issue, it need not address the issue of ITA's methodology regarding work-in-process.

Accordingly, ITA's determination on remand is sustained.