IPSCO, INC. and Ipsco Steel, Inc.,
Plaintiffs/Cross–Appellants,

and

The Algoma Steel Corporation, Ltd.
and Sonco Steel Tube Div.,
Ferrum, Inc., Plaintiffs,

v.

The UNITED STATES, Defendant–
Appellee,

v.

LONE STAR STEEL COMPANY,
Defendant–Appellant.

Nos. 91–1236, 91–1257.

United States Court of Appeals,
Federal Circuit.

June 3, 1992.

Rufus E. Jarman, Jr., Barnes, Richardson & Colburn, New York City, argued for plaintiffs/cross-appellants. With him on the brief was Alan Goggins.

Valerie A. Slater, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., argued for defendant-appellant.

Jeanne E. Davidson, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellee. With her on the brief were Stuart M. Gerson, Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief was Thomas G. Ehr, Atty.–Advisor, Office of the Chief Counsel for Import Admin., Dept. of Commerce, of counsel.

Before RICH, Circuit Judge, SMITH, Senior Circuit Judge, and RADER, Circuit Judge.

RADER, Circuit Judge.

In a case challenging an antidumping investigation, the Lone Star Steel Company appealed a May 18, 1989, order of the United States Court of International Trade. *IPSCO, Inc. v. United States*, 714 F.Supp. 1211 (Ct. Int'l Trade 1989) (*IPSCO II*). This order rejected the United States Department of Commerce International Trade Administration's (ITA) method of calculating the value of oil country tubular goods (OCTG). Because ITA reasonably interpreted 19 U.S.C. § 1677b(e) (1988), this court reverses the trial court's order and upholds ITA's original calculation method.

Cross-appellants, IPSCO, Inc., and IPSCO Steel, Inc. (IPSCO), appealed an October 30, 1990, order of the trial court. *IPSCO, Inc. v. United States*, 749 F.Supp. 1147 (Ct. Int'l Trade 1990) (*IPSCO IV*). This order sustained ITA's decision to base the value of a particular grade of OCTG on three, rather than six, months of tonnage data. Because IPSCO did not timely object, this court affirms the trial court's order.

## BACKGROUND

OCTG—steel pipe for oil and gas wells—comes in two grades: prime and limited-service. After production of a manufacturing lot, the producer categorizes the pipe into two OCTG grades. Pipe that meets the standards of the American Petroleum Institute (API) becomes prime OCTG. Pipe

beneath API standards becomes limited-service OCTG. The API standards rate pipe based on stress and serviceability tests.

Producers sell prime OCTG under a warranty and at a higher price than limited-service OCTG. Limited-service OCTG sells without a warranty and at prices below prime OCTG. Other than quality and market value, there are no differences between prime and limited-service OCTG. The same materials, processes, labor, and overhead go into the manufacturing lot which yields both grades of OCTG. Moreover buyers purchase the separate grades for the same purpose—"down hole" use in oil and gas wells.

In July 1985, Lone Star Steel, a domestic producer of OCTG, filed an antidumping petition against Canadian OCTG producers. In 1986, the ITA determined that Canadian producers had sold pipe in the United States at less than fair value. *Antidumping; Oil Country Tubular Goods from Canada; Final Determination of Sales at Less than Fair Value*, 51 Fed.Reg. 15029 (Apr. 22, 1986), *as amended*, 51 Fed.Reg. 29579 (Aug. 19, 1986). ITA's determination extended to both prime and limited-service OCTG. *Id.* at 15,036.

ITA later issued an antidumping duty order. *Antidumping Duty Order; Oil Country Tubular Goods (OCTG) from Canada*, 51 Fed.Reg. 21782 (June 16, 1986), *as amended*, 51 Fed.Reg. 29579 (Aug. 19, 1986). Canadian pipe producers, including IPSCO, appealed ITA's final determination to the Court of International Trade. *IPSCO, Inc. v. United States*, 687 F.Supp. 633 (Ct. Int'l Trade 1988) (*IPSCO I*). IPSCO challenged ITA's method for assigning costs to limited-service OCTG. In particular, IPSCO challenged ITA's equal allocation of production costs between the prime and limited-service pipe. Because produced simultaneously, limited-service and prime pipe in fact had identical production costs. ITA treated limited-service pipe as a co-product of prime pipe.

IPSCO argued that ITA should instead treat limited-service OCTG as a by-product. When calculating values under 19 U.S.C. § 1677b(e), the ITA generally deducts the value of by-products from the combined cost of producing the prime product. By-products, however, are secondary products not subject to investigation. *IPSCO II*, 714 F.Supp. at 1213 n. 2.

Upon initial consideration, the trial court remanded the case to ITA for a fuller explanation of its method for calculating value. *IPSCO I*, 687 F.Supp. at 638. On September 2, 1988, ITA restated the reasons for treating limited-service OCTG as a co-product. ITA relied heavily on IPSCO's treatment of limited-service OCTG as a co-product in some financial statements.

IPSCO again challenged ITA's decision. *IPSCO, Inc. v. United States*, 714 F.Supp. 1211 (Ct. Int'l Trade 1989) (*IPSCO II*). In *IPSCO II*, IPSCO again argued that limited service OCTG is a by-product. IPSCO also argued that ITA should set a lower home market value for limited-service OCTG imported into the United States. *Id.* at 1213.

The trial court rejected IPSCO's by-product argument. *Id.* at 1213–14. The court, however, did not embrace ITA's valuation method. Treating limited-service OCTG as a co-product, ITA had split the production costs equally between prime and limited-service OCTG. The court reasoned that ITA's method did not account for differences in value between prime and limited-service OCTG. *Id.* at 1215. Thus, the trial court remanded to ITA a second time. On remand, the court instructed ITA to account for these value differences. *Id.*

ITA issued a second remand determination on November 8, 1989. This time ITA allocated the cost of production between prime and limited-service OCTG based on their proportionate market value. Under this revised method, the allocated production cost for limited-service OCTG was less than its actual production cost. These reductions in production cost also reduced the overall foreign market value for limited-service OCTG.

This new value-based cost allocation, however, had the opposite effect on prime pipe's foreign market value. With less of the costs of producing a lot of OCTG allocated to limited-service product, the prime

product received a higher cost allocation. A higher production cost meant that prime pipe had a higher foreign market value. Thus, ITA's new method shifted costs from limited-service to prime pipe.

At this point, IPSCO challenged another aspect of ITA's cost assessment. IPSCO argued that ITA had erroneously based its value calculation for a particular grade of OCTG on only three months of tonnage data. ITA had used six months of data for other grades of OCTG. IPSCO argued that ITA should have corrected this ministerial error. *See* 19 U.S.C. § 1673d(e) (1988). The trial court remanded to ITA to determine whether IPSCO raised the alleged error "within a reasonable time" after ITA's original final determination, as required by section 1673d(e). *IPSCO, Inc. v. United States*, No. 90–37, 1990 WL 51968 (Ct. Int'l Trade Apr. 16, 1990) (*IPSCO III*).

On May 22, 1990, ITA issued a third remand determination reconfirming its second remand determination. ITA was unable to determine if any error had actually occurred. However, ITA concluded that IPSCO could have discovered with due diligence any erroneous calculations and data. IPSCO appealed ITA's third remand determination. *IPSCO IV*, 749 F.Supp. at 1147. The court ruled against IPSCO. *Id.* at 1150.

Lone Star Steel appeals the court's *IPSCO II* decision to reverse and remand ITA's method of assigning costs to limited-service pipe. IPSCO cross-appeals the court's *IPSCO IV* decision to sustain ITA's refusal to recalculate values for a particular grade of pipe.

## DISCUSSION

### I.

When ITA determines that a foreign entity has sold merchandise in the United States at less than fair value, and the International Trade Commission finds the domestic industry injured by the importation of that merchandise, Title 19 imposes an antidumping duty. 19 U.S.C. § 1673 (1988). The duty is the amount by which the merchandise's foreign market value exceeds its United States price. *Id.* Foreign market value is the price of the merchandise in the producer's home market or its export price to countries other than the United States. 19 U.S.C. § 1677b(a)(1). In setting forth the computation for foreign market value, however, section 1677b disregards, under specified circumstances, home or export market sales at less than the cost of production. 19 U.S.C. § 1677b(b). If home or export market sales do not yield a reliable measure of foreign market value, the statute directs computation of a constructed value in lieu of the foreign market value. *Id.*

The statute gives a specific formula for assessing constructed value:

(e) Constructed value

(1) Determination

For the purposes of this subtitle, the constructed value of imported merchandise shall be the sum of—

(A) the cost of materials (exclusive of any internal tax ...) and of fabrication or other processing of any kind employed in producing such or similar merchandise ...

(B) an amount for general expenses and profit ...

....

(C) the cost of all containers and coverings of whatever nature....

19 U.S.C. § 1677b(e). This section defines constructed value as the combined cost of materials, fabrication or other processing of any kind, general expenses and profit, and other incidental shipping expenses. The cost of materials encompasses the cost of raw components in the manufacturing process. The cost of fabrication or other processing of any kind encompasses capital and labor costs. The cost of general expenses encompasses overhead. The statute also includes profit within constructed value. The statute provides minimum values for general expenses and profit in terms of percentages of materials and fabrication costs. 19 U.S.C. § 1677b(e)(1)(B)(i) and (ii). By its terms, the statute expressly covers actual production costs. The broad terms of section

1677b(e) sweep within constructed value all components of the actual production costs of merchandise. The statute, for instance, includes fabrication costs, yet emphasizes that the cost of "other processing of any kind" also falls within constructed value. The broad language of section 1677b(e) does not at any point expressly authorize adjustment of these production costs to account for products of a lower grade or less value.

In addition to its language, the constructed value section's context within Title 19 suggests computation of actual production costs. Under section 1677b(b), ITA must determine whether the price of home market sales is a proper measure of foreign market value. Section 1677b(b) requires ITA to disregard home market sales at prices below the "cost of producing the merchandise." If neither home market nor third-party exports provides an adequate basis for determining foreign market value, ITA must calculate instead a constructed value. ITA then compares the constructed value with sales prices in the United States to determine the antidumping duty. 19 U.S.C. § 1673. Thus, constructed value comes into play when ITA determines that a foreign producer sells at home below its "cost of producing the merchandise." This context, confirmed by the language of section 1677b(e), links constructed value and section 1677b(b)'s "cost of producing the merchandise."

Although the statute does not specifically define "cost of production"—the benchmark for assessing whether home or third-party export market prices are below cost—the regulations defining the term emphasize its link to constructed value. The Department of Commerce's antidumping regulations provide:

> The Secretary will calculate the cost of production based on the cost of materials, fabrication, and general expenses, but excluding profit, incurred in producing such or similar merchandise.

19 C.F.R. § 353.51(c) (1990), *superseding* 19 C.F.R. § 3537(b) (1989). Thus, the regulations adopt the terms of the constructed value section—cost of materials, fabrica-

tion, and general expenses—to define "cost of production." Indeed the trial court in this case correctly discerned no distinction "in any way significant to this case" between section 1677b(b)'s cost of production and the cost of production utilized in calculating constructed value. *IPSCO II,* 714 F.Supp. at 1216 n. 9. Thus, the context and the language of the statute show that constructed value is based on the cost of producing the merchandise.

The legislative history of Title 19 discloses a reliance on cost of production as an independent standard. In reference to section 1677b(b), the Senate committee report stated:

> [I]n the absence of such a provision, sales uniformly made at less than cost of production could escape the purview of the Act, and thereby cause injury to United States industry with impunity.

S.Rep. No. 1298, 93d Cong., 2d Sess. 173 (1974); *reprinted in* 1974 U.S.C.C.A.N. 7186, 7310. The legislative history confirms the statute's unambiguous intent to provide cost of production as an independent yardstick for deciding whether home and export sales prices are suitable for fair value comparisons. Within section 1677b(e), the constructed value section, cost of production also emerges as an alternative independent standard for fair value.

In lieu of computing a foreign market value for IPSCO's OCTG, ITA calculated a constructed value. In making this calculation, ITA counted the actual cost of materials, fabrication, and overhead for limited-service and prime OCTG. Because the same manufacturing lot produced both grades of pipe, ITA allocated production costs equally between limited-service and prime OCTG. In sum, ITA calculated constructed value precisely as the statute directs. Because IPSCO expended the same materials, capital, labor, and overhead for both grades of OCTG, the constructed value of one ton of limited-service pipe necessarily matched the constructed value of one ton of prime pipe.

ITA thus treated limited-service pipe as a co-product, not as a by-product. ITA fur-

ther explained its reasons for this treatment:

> Because the off-spec merchandise is used as OCTG and can be very similar to prime merchandise, we have included it in this investigation and made comparisons of United States price with foreign market value for sales of off-spec merchandise. In order to allow such comparison, we rejected IPSCO's methodology of treating off-spec production as a by-product.

51 Fed.Reg. at 15036.

Because ITA computed constructed value according to the unambiguous terms of Title 19, the trial court erred in rejecting that method:

> By declining to account for differences in value and treating prime and limited service products identically in its calculation of foreign market value, ITA made an unreasonable fair value comparison....

*IPSCO II*, 714 F.Supp. at 1215. On remand, ITA complied with the trial court's order by calculating costs for both limited-service and prime products on the basis of their relative prices in the United States market. In other words, the value of IPSCO's products—their prices in the United States—became a factor in determining their cost of production. That cost of production, in turn, determined by IPSCO's prices in the United States reflected fair value.

Essentially, the trial court ordered an unreasonable circular methodology. The selling price of pipe became a basis for measuring the fairness of the selling price of pipe. This circular reasoning contravened the express requirements of the statute which set forth the cost of production as an independent standard for fair value.

In light of the language of Title 19, ITA's original methodology for calculating constructed value was a consistent and reasonable interpretation of section 1677b(e). The trial court therefore also erred in substituting "its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron U.S.A. v. Natural Re-*

*sources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *IPSCO, Inc. v. United States*, 899 F.2d 1192, 1194–95 (Fed.Cir.1990) ("We give due weight to the agency's interpretation of the statute it administers, and we accept that interpretation if it is 'sufficiently reasonable.'"); *U.H.F.C. Co. v. United States*, 916 F.2d 689, 698 (Fed.Cir.1990) ("It is well settled that an agency's interpretation of the statute it has been entrusted by Congress to administer is to be upheld unless it is unreasonable.").

### II.

■ After ITA had completed its investigation pursuant to the trial court's second remand order, IPSCO discovered that ITA had used only three months of data to calculate constructed value. IPSCO requested correction of this alleged error. The court remanded again to ITA to determine whether it used correct tonnage data. ITA determined that, regardless of whether an error occurred, the three months of data was relevant to the question. Moreover IPSCO could have discovered the error earlier through due diligence. At that point, the court sustained as a final determination ITA's response:

> Whatever the source of confusion, the relevant tonnage data was in the original record, it was significant to the outcome of the original determination, it involved an important product, and it could have been found without *unduly* burdening plaintiff.

*IPSCO IV*, 749 F.Supp. at 1150 (emphasis in original).

This court discerns no error in the trial court's rejection of IPSCO's request for correction of the alleged "error." IPSCO did not raise the alleged error until December of 1989, nearly forty-four months after ITA's original final determination. During that lengthy period of active litigation spanning two remand proceedings, IPSCO did not exercise due diligence. IPSCO has no reasonable excuse for its failure to detect the use of three months of data for some grades of OCTG.

The trial court properly balanced IP-SCO's lack of due diligence against the interests of judicial and administrative finality:

Judicial economy, fairness to the parties and the need to fulfill Congress's intent of prompt resolution of these matters requires that errors of methodology, data selection, calculation, etc. all be raised from the outset, unless some extraordinary factor supports relief at a later date. The court finds no extraordinary factor present here.

*Id.* This court discerns no error in this reasoning.

IPSCO argues that 19 U.S.C. § 1675(f) compels correction of this error. Section 1675(f) of Title 19 authorizes the Department of Commerce to adopt procedures for correction of ministerial errors "within a reasonable time" after issuance of a final determination. *See also* H.R.Rep. No. 40, 100th Cong., 1st Sess., pt. 1, at 144 (1987) (This provision allows "for the correction of ministerial errors in final determinations within a limited time period after their issuance."). However, IPSCO did not seek correction of this alleged error within a reasonable time.

## CONCLUSION

With respect to Lone Star Steel's appeal, this court reverses the trial court's decision in *IPSCO II* and remands with instructions to recalculate constructed value using ITA's original methodology. ITA's original method was a reasonable interpretation of 19 U.S.C. § 1677b(e).

With respect to IPSCO's cross-appeal, this court affirms the trial court's decision in *IPSCO IV*. IPSCO did not raise the alleged error within a reasonable time after the original final determination.

## COSTS

Each party will bear its own costs.

REVERSED–IN–PART, AFFIRMED–IN–PART and REMANDED.