Slip Op. 99-85

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| American Silicon Technologies, Elkem Metals Co., and Globe Metallurgical, Inc., | **:** | |
| | **:** | |
| Plaintiffs, | | **Court No. 98-03-00567** |
| | **:** | |
| v. | | **Before: Barzilay, Judge** |
| | **:** | **Public Version** |
| United States of America, | | |
| | **:** | |
| Defendant, | | |
| | **:** | |
| and | | |
| | **:** | |
| RIMA Industrial S.A. and General Electric Co., | | |
| | **:** | |
| Defendant-Intervenors. | **:** | |

[Plaintiffs' Motion for Judgment Upon the Agency Record granted in part, and denied in part; remanded to Commerce.]

Decided: August 19, 1999.

Baker & Botts, L.L.P. (William D. Kramer, Clifford E. Stevens, Jr.), for Plaintiffs.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice (Randi Rimerman Serota); David Mason, Jr., Attorney Advisor, Office of the Chief Counsel, Department of Commerce, of counsel, for Defendant.

Dewey Ballantine, LLP. (Michael H. Stein, Bradford L. Ward, Jennifer Danner Riccardi, and Andrew J. Conrad), for Defendant-Intervenor, General Electric Co..

Dorsey & Whitney, L.L.P., (Munford Page Hall, II, Philippe M. Bruno), for Defendant-Intervenor, Rima Industrial S/A.

### OPINION

### I. INTRODUCTION

**BARZILAY, JUDGE:**

This case is before the Court pursuant to 19 U.S.C. § 1516a and 28 U.S.C. § 1581(c) on

Plaintiffs' USCIT R. 56.2 Motion for Judgment Upon the Agency Record. Plaintiffs challenge

certain aspects of the Department of Commerce, International Trade Administration's

("Commerce") final determination in *Silicon Metal from Brazil; Notice of Final Results of*

*Antidumping Duty Administrative Review*, 63 Fed. Reg. 6,899 (Feb. 11, 1998). Defendant

partially opposes Plaintiffs' motion, but agrees that a remand is required to enable Commerce to

reconsider a number of issues listed in the opinion below. For the reasons set out in the opinion

which follows, the Court grants in part, and denies in part Plaintiffs' Motion for Judgment Upon

the Agency Record and remands to Commerce.

## II.   BACKGROUND

On July 31, 1991, Commerce published an antidumping duty order on silicon metal from

Brazil. *Antidumping Duty Order: Silicon Metal from Brazil*, 56 Fed. Reg. 36,135 (July 31,

1991). On July 8, 1996, Commerce published a Notice of Opportunity to Request

Administrative Review. 61 Fed. Reg. 35,712 (July 8, 1991). In response, RIMA Industrial S/A

("RIMA") and several other Brazilian producers of silicon metal requested that Commerce

initiate an administrative review covering entries of the subject merchandise for the period of

July 1, 1995 to June 30, 1996. *Initiation of Antidumping and Countervailing Duty*

*Administrative Reviews*, 61 Fed. Reg. 42,416 (Aug. 15, 1996).

In May 1997, Commerce concluded a verification of RIMA's records in Brazil. In its

verification report Commerce noted that RIMA did not depreciate its assets in its accounting

ledgers from 1987 to 1995. U.S. Dept. of Commerce Internal Memo from A. Braier to J. Doyle,

Case No. A-351-806 at 28-9 (May 8, 1997). During this period, RIMA would not have

benefitted from deducting depreciation expense for tax purposes because it was not profitable

and was in bankruptcy. RIMA's Sales Verification Exhibit S-23.

In 1996, RIMA resumed recording its depreciation expenses. Accordingly, RIMA's

independent auditors calculated the company's 1996 depreciation expenses by preparing detailed depreciation worksheets back to 1987 (the year RIMA stopped deducting depreciation expenses). *Id.* In calculating depreciation, RIMA utilized a five year straight line method of depreciation for its furnaces and other machinery and equipment starting in 1996.

On August 8, 1997, Commerce issued preliminary results in this administrative review, finding that silicon metal from Brazil produced by RIMA and other producers was being sold at less than fair value ("LTFV"), and assessing preliminary margins of 31.6% as to RIMA based upon the previous review assuming that no shipments had been made during the present period of review ("POR"). *Silicon Metal from Brazil; Preliminary Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 42,759 (Aug. 8, 1997).

On February 11, 1998, Commerce published the Final Results of the administrative review, finding that silicon metal from Brazil produced by RIMA and other producers was being sold at LTFV. *Silicon Metal from Brazil; Notice of Final Results of Antidumping Duty Administrative Review*, 63 Fed. Reg. 6,899 (Feb. 11, 1998) ("Final Results"). Commerce, based upon additional information provided by RIMA showing that shipments had been made during the POR, determined that the percentage margin for RIMA was 3.08% from the period March 1, 1995 to February 29, 1997.

On March 13  and April 13, 1998, respectively, Plaintiff American Silicon Technologies ("American Silicon") filed a summons and complaint challenging certain parts of the final results of the administrative review. Specifically, American Silicon contests: 1) Commerce's use of RIMA's reported depreciation expenses; 2) the offset to RIMA's financial expenses for financial revenue; 3) Commerce's failure to include RIMA's foreign exchange losses; and 4) Commerce's failure to deduct Brazilian port warehousing expenses incurred by RIMA from export price. On

November 18, 1998, American Silicon filed its Motion for Judgment Upon the Agency Record.

### III.    STANDARD OF REVIEW

In this review of Commerce's final determination, the Court is charged to hold unlawful any determination, finding, or conclusion that is unsupported by "substantial evidence on the record, or is otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).  "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion."  *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986) (citations omitted), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987).

To determine whether Commerce has acted in accordance with law, the Court must undertake the two step analysis prescribed by *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  First, the Court must determine whether the statute speaks to the precise question at issue.  *Id.* at 842.  If the statute is clear or the legislative history unambiguously expresses Congress' intent, then the matter is at an end for the agency cannot contravene the will of Congress.  *Id.* at 842-43.  Second, if the Court determines that the statute is silent or ambiguous, the question then becomes whether the agency's construction of the statute is permissible.  *Id.* at 843.  Essentially, this is an inquiry into the reasonableness of Commerce's interpretation.  *See Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996).  Thus, Commerce's conclusion must be a "rational decision."  *Matsushita Electric Industrial Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).  Provided Commerce has acted rationally, the Court may not substitute its judgment for that of the agency.  *See IPSCO, Inc. v. United States*, 965 F.2d 1056, 1061 (Fed. Cir. 1992).  The "court will sustain the determination if it is reasonable and supported by the record as a whole, including whatever

fairly detracts from the substantiality of the evidence." *Negev Phosphates, Ltd. v. United States*, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988).

## IV.    DISCUSSION

A.        *Issues for which Commerce agrees to remand*

American Silicon and Commerce request, and the Court grants, that the following issues be remanded for the appropriate calculations and disposition:

1.        Commerce agrees with American Silicon that it did not consider all of the evidence pertaining to the issue of the use of RIMA's short term interest income on working capital as an offset to interest expense. Thus, Commerce requests a remand to determine whether to offset RIMA's interest expense.

2.        Commerce concedes that it erred by including no foreign exchange losses for 1996 in the calculation of RIMA's financial expenses. Thus, Commerce requests a remand to appropriately recalculate financial expenses.

3.        Commerce concurs that it erred by not deducting the warehouse expenses from export price in its calculation of RIMA's antidumping margin. Thus, Commerce requests a remand to deduct warehouse expenses in recalculating RIMA's antidumping margin.

B.        *The Contested Depreciation Issue*

The issue brought to the Court by American Silicon is whether Commerce properly relied upon the depreciation expenses reported by RIMA in calculating cost of production ("COP") and constructed value ("CV").[1]

---

[1]  This calculation is undertaken by Commerce when it determines that normal value cannot be ascertained by comparing sales in the exporting country to sales in the United States.

American Silicon argues that Commerce's calculations in this review do not comport with the statutory requirements of 19 U.S.C. 1677b(1)(A) which provides that for purposes of COP and CV calculations:

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer, in particular for establishing appropriate amortization and depreciation periods, and allowances for capital expenditures and other development costs.

Specifically, American Silicon claims that Commerce understated RIMA's dumping margin because it used RIMA's reported depreciation. *Pl.'s Br. in Support of Mot. for J. Upon the Ag. Record* ("*Pl.'s Br.*") at 6. RIMA's depreciation is understated, Plaintiff claims, because for the period of 1987-1995, RIMA used a 20% rate (a five year depreciation period) for machinery and equipment and a 10% (ten year depreciation period) for installations. *Id.* at 7. Thus, American Silicon contends that these were accelerated deductions which rendered a significant portion of RIMA's fixed assets fully depreciated prior to July 1995, the first month of the period of review, and that the actual costs of producing silicon metal are distorted. *Id.* at 8-10.

American Silicon further contends that this accelerated depreciation does not comport with United States or Brazilian Generally Accepted Accounting Principles ("GAAP"). *Id.* at 18. American Silicon argues that Commerce may not use foreign company accounting records or practices if they do not reasonably reflect the costs associated with the production and sale of merchandise. *Id.* at 10. American Silicon also contends that a five year depreciation period

---

See 19 U.S.C. 1677b(a)(1) and (4).

does not adequately allocate the cost of RIMA's assets over their economic useful life, Plaintiff's preferred method of depreciation. *Id.* at 11-13. According to American Silicon, and based upon another company's records, the economic useful life of a silicon metal furnace is 20 years. *Id.* at 8. Thus, Plaintiff argues, RIMA's use of a five year depreciation period grossly distorts costs because it shifts acquisition costs of all equipment to the period of 1987-1991, years before the period of review. *Id.* at 12-13.

Moreover, American Silicon asserts that RIMA prepared depreciation worksheets solely for the review in question and that they are not part of its accounting system and that RIMA did not actually record depreciation in its internal accounting statements. *Id.* at 17-18. American Silicon also argues that RIMA's reported depreciation expenses did not reconcile with the fixed asset values stated in the company's financial statements, and therefore, the depreciation that appeared on the financial statements was unreliable. *Id.*

Commerce contends that the depreciation methodology used by RIMA is consistent with Brazilian GAAP, and that its reliance upon RIMA's records was reasonable. *Def.'s Br. in Partial Opp. to Pl.'s Mot. for J. Upon Agency Record* ("*Def.'s Br.*") at 5.

Commerce argues that rejection of a company's records is appropriate only when there is an extreme allocation of depreciation to the first year; a depreciation of idle assets; a change in depreciation methodology; or the shifting of costs away from the subject merchandise. *Id.* at 6-7. Commerce did not find that any of these factors existed. *Id.* at 7-8. Commerce did find that RIMA had historically used this depreciation method; that the methodology was consistent with Brazilian GAAP and accepted by Commerce in prior segments of proceedings; and that alteration of the methodology in the review would lead to inequitable double counting of depreciation costs. *Id.* at 8-9.

Commerce asserts that its acceptance of RIMA's reported depreciation was consistent

with its administrative practice because the expenses were reflected in financial statements, were

independently audited, and were in accordance with Brazil's GAAP. *Id.* at 11. Commerce also

asserts that, under Brazilian GAAP, it is not unusual for companies to use accelerated tax-based

depreciable lives for machinery and equipment. *Id.* at 16-17. In fact, claims Commerce,

RIMA's cost verification report states that when machinery and equipment are used continuously

(24 hours a day; seven days a week) Brazilian law allows depreciation of machinery and

equipment over a five year period. *Def.-Intervenor Response to Pl.'s Mot. for J. upon Agency*

*Record* ("*Def.-I.'s Resp.*") at 17. RIMA's machinery was used continuously for five years. *Id.*

Independent auditors attested to the fact that under Brazil's GAAP, companies are permitted to

use whatever rate of depreciation they choose, as long as the companies are able to prove that the

term is adequate and suitable for the asset category. *Def.'s Br.* at 18. RIMA's auditors stated

that the company's depreciation was sound and fully consistent with Brazilian GAAP and that it

accurately reflected actual depreciation costs. *Id.*

Commerce proffers the cost verification report which states that the independent auditors

found that:

> the calculation and methodology which was used for depreciation for both the
> financial statements and for reporting depreciation expenses to the Department . . .
> is sound, fully consistent with Brazilian GAAP and accurately reflects actual
> depreciation costs . . . .

*Def.-I.'s Resp.* at 12.

The independent auditors state that:

> Our examination was carried out according to auditing norms and include: (a) the
> planning of the work considering the relevance of the balances, the volume of
> transactions and the accounting systems and internal controls of the company; (b)
> the verification, based on tests, of evidence and registers which support the figures

and accounting information published, and (c) the evaluation of the most significant accounting practices and estimates adopted by the Administration, as well as the financial statements taken as a whole . . . .  The statements presented were drawn up according to principles applicable to companies in the normal course of activities.

*Id.* at 12-13.

With regard to the unreliability of RIMA's financial statements, Commerce argues that RIMA provided it with worksheets which demonstrate that the company's depreciation reconciled with the amount recorded in the financial statements audited by the independent auditors.  *Def.'s Br.* at 23.

In fact, Commerce states that during the preliminary determination, it had rejected RIMA's reported depreciation because it did not reconcile with its financial records.  *Id.* However, when the company provided Commerce with worksheets which did reconcile with the audited financial statements, Commerce reversed its position.  *Id.* at 24.  After Commerce's initial rejection, RIMA consulted independent  auditors who identified amounts of depreciation which RIMA should have included in its financial statements.  *Id.*  at 22-23.  Commerce then adjusted COP and CV based upon the auditor's opinion and upon the worksheets which did reconcile with the financial statements.  *Id.* at 24-26.

Finally, Commerce argues that rejecting RIMA's reported depreciation would lead to double counting.  *Id.* at 27.  Commerce asserts that this depreciation method has been used to calculate COP in prior reviews.  *Id.*  Commerce accepted RIMA's depreciation method during the 1992-93 and 1994-95 reviews.  *Id.*  Thus, rejecting it at this point would double count depreciation already accounted for in previous reviews.  *Id.*

The Court finds that American Silicon has failed to demonstrate that Commerce's decision to use RIMA's depreciation expenses is distortive and, therefore, contrary to the statute.

In examining this issue, the Court relies upon 19 U.S.C. § 1677b(f)(1)(A) and the Statement of

Administrative Action ("SAA"). 19 U.S.C. § 1677b(f)(1)(A) provides that, for purposes of COP

and CV calculations:

> Costs shall normally be calculated based on the records of the exporter or
> producer of the merchandise, if such records are kept in accordance with the
> generally accepted accounting principles of the exporting country . . . and
> reasonably reflect the costs associated with the production and sale of the
> merchandise. The administering authority shall consider all available evidence on
> the proper allocation of costs, including that which is made available by the
> exporter or producer on a timely basis, if such allocations have been historically
> used by the exporter or producer, in particular for establishing appropriate
> amortization and depreciation periods, and allowances for capital expenditures
> and other development costs.

The relevant portion of the SAA provides:

> In determining whether a company's records reasonably reflect costs, Commerce
> will consider U.S. generally accepted accounting principles employed by the
> industry in question. For example, a company's records might not fairly allocate
> the cost of an asset if a firm's financial statements reflect an extremely large
> amount of depreciation for the first year of an asset's life, or if there is no
> depreciation expense reflected for assets that have been idle. In such a situation, it
> would be appropriate for Commerce to adjust depreciation expenses. Costs shall
> be allocated using a method that reasonably reflects and accurately captures all of
> the actual costs incurred in producing and selling the product under investigation
> or review . . . . Commerce also will consider whether the producer historically
> used its submitted cost allocation methods to compute the cost of the subject
> merchandise prior to the investigation or review and in the normal course of its
> business operations. Also, if Commerce determines that costs, including
> financing costs, have been shifted away from production of the subject
> merchandise, or the foreign like product, it will adjust cost appropriately, to
> ensure they are not artificially reduced.

Agreement on Implementation of Article VI of the GATT, Statement of Administrative Action

807, 834-35, *reprinted in*, 1994 U.S.C.C.A.N. 4040, 4172.

Applying step one of the *Chevron* analysis to this precise issue, the Court notes that the

statute is silent with regard to the method Commerce must use to establish depreciation expenses

in COP calculations. Therefore, the Court must determine whether Commerce's construction of

the statute is reasonable and, pursuant to the statutorily mandated review standard, 19 U.S.C. 1516a(1)(B), whether it is supported by substantial evidence.

The record shows that although RIMA did not record depreciation in its accounting ledgers for the period of 1987 to 1995 [because the company was undergoing bankruptcy], the worksheets provided to Commerce and based on RIMA's financial records did reconcile with its verified and audited financial statements. *See* RIMA's Feb. 26, 1997 Supplemental Response to Commerce's Feb. 14, 1997 Supplemental Questionnaire. The worksheets and audited financial statements showed that had RIMA properly reported its depreciation expense in the financial statements, those values would have been the same values obtained through the calculations contained in the submitted worksheets which use a straight line method over the company's estimated useful life of the assets. *Id.* at 26. RIMA fully demonstrated and Commerce properly determined that the costs of its assets contained in the depreciation worksheets reconciled to its financial statements; the worksheets calculated depreciation on the monetarily corrected costs using a straight line method over RIMA's estimated useful life of the assets; and the depreciation expense shown on the worksheets reconciled to the depreciation expense reported in the audit opinion of its financial statements. *Id.* at 27. Moreover, RIMA depreciated its machinery and equipment 20% over five years; thus, the company did not take an extremely large amount of depreciation during the assets' first year. Therefore, its method is not suspect under the SAA.

In addition, the Court finds it unnecessary to sort out which governing Brazilian body determines Brazilian GAAP and defers to Commerce for that determination. Nevertheless, there is no evidence on the record that RIMA's financial records are not kept in accordance with Brazilian GAAP. The records were audited by independent Brazilian auditors who confirmed adherence to a permissible depreciation methodology. *Id.* at 18-19.

Where "the reviewing court is faced with two opposing views of the record, that of Commerce and that of the petitioner, it is the function of the Court to uphold the determination of the agency if it is substantiated by evidence on the record and is otherwise in accordance with law." *Hercules Inc. v. United States*, 11 CIT 710, 739-40, 673 F. Supp. 454 (1987). In that case, defendant-intervenor, SNPE, challenged the injury determination related to its depreciation costs calculations. *Id.* at 746. SNPE argued that Commerce erred in using an accelerated depreciation tax method rather than a straight line method. *Id.* at 755. Commerce defended its position by stating that SNPE deviated from its own normal accounting practice by utilizing the straight line method. *Id.* Commerce also argued that it was SNPE's duty to provide verifiable substantiating evidence to support its claim that depreciation costs would be more accurately reflected by straight line methodology. *Id.* Commerce provided its own verification reports to substantially support its findings. *Id.* The court held that Commerce's determination was supported by substantial evidence because Commerce had chosen the verified financial statements as the best information available. *Id.* at 756. Thus, Commerce was not required to accept SNPE's unverified allegation that the straight line methodology would more accurately reflect costs. *Id.*

Similarly, in the case at hand, Commerce used RIMA's verified financial statements which were independently audited by Brazilian auditors. These records provided Commerce with the means to make a rational decision supported by substantial evidence. American Silicon does not provide verifiable records to prove otherwise. Thus, the Court will not substitute its judgment for that of Commerce that RIMA's depreciation method is consistent with generally accepted accounting principles. As the Federal Circuit court stated in *Daewoo Electronics v. United States*, 6 F.3d 1511, 1517-18 (1993) (citations omitted):

The specific determination we make is whether the evidence and reasonable

inferences from the record support [Commerce's findings]. The question is whether the record adequately supports the decision of [Commerce], not whether some other inference could reasonably have been drawn. As frequently stated, 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.

In this case, the record amply supports Commerce's decision to use the depreciation method set forth in RIMA's audited and verified financial records.[2]

Moreover, the Court rejects American Silicon's argument that a five year estimated useful life is inappropriate.  United States GAAP does not set forth specifics regarding an asset's estimated useful life.  Entities have much leeway in estimating useful life, as long as the entity meets the goal of depreciation, i.e.: "to provide for a reasonable, consistent matching of revenue and expense by allocating the cost of the depreciable asset systematically over its estimated useful life."  MILLER GAAP GUIDE 1999, at Ch. 11, Depreciable assets and depreciation -- Depreciation , *available in* LEXIS, ACCTG Library, GAAP File.  In addition to the commonly used methods of depreciation, such as straight-line, units of production, sum-of-the-years'-digits, and declining balance, entities may choose other methods which meet the criteria of systematic and rational.  *Id.*

United States GAAP states that the "estimated useful life of a depreciable asset is the period over which services are expected to be rendered by the asset.  An asset's estimated useful life may differ from company to company or industry to industry." *Id.* at Principles of Accounting for Depreciable Assets.  With respect to the use of an asset after the time it has been

---

[2]The Court notes a recent decision by this court to remand to Commerce a similar depreciation methodology as distortive.  *See American Silicon Technologies v. United States*, No. 99-34 (CIT April 9, 1999). The Court declines to follow this decision for the reasons discussed herein and in *Hercules* and *Daewoo*.

completely depreciated, United States GAAP notes that "[t]otal utility of an asset, expressed in time, is called physical life. The utility of an asset to a specific owner, expressed in time, is called the service life." *Id.* Thus, the estimated useful life is separate and distinct from the amount of time that machinery and equipment may actually operate. In this regard, American Silicon's argument that RIMA's depreciation method is distortive because RIMA is still using its machinery and equipment after full depreciation, logically must fail. Merely because an asset which has been fully depreciated is still being used does not mean that there has been a distortive shift away from systematically and rationally capturing the costs of the machinery and equipment.

In addition, the Court agrees with Commerce when it argues against changing the depreciation methodology from that accepted in prior reviews. Because of the manner in which judicial and administrative reviews of antidumping duty orders occur in one year periods, each a separate proceeding, it is especially important for all parties that consistent methods be sustained when possible. Here, the business records reasonably reflect costs as required by the statute and the agency demonstrated a consistent administrative practice which is reasonable and permitted by the statute.

Therefore, the Court sustains Commerce's conclusion that RIMA's reported depreciation methodology is acceptable.

## IV.  CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's Motion in part, denies it in part, and remands. An order will be entered accordingly.


Dated: _____                    _____
        New York, NY                                            Judith M. Barzilay
                                                                Judge