Slip Op. 06-141
UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                          )
SICHUAN CHANGHONG ELECTRIC CO., LTD.,     )
                                          )
                Plaintiff,                )
                                          )   Richard K. Eaton,
            and                           )   Judge
                                          )
PHILIPS ELECTRONICS NORTH AMERICA CORP.,) 
APEX DIGITAL INC., PHILIPS CONSUMER       )   Consol.
ELECTRONICS CO. OF SUZHOU LTD., TCL       )   Court No. 04-00265
CORP.,                                    )
                                          )
        Plaintiff-Intervenors,            )   Public
                                          )   Version
            v.                            )
                                          )
UNITED STATES,                            )
                                          )
        Defendant,                        )
                                          )
            and                           )
                                          )
INTERNATIONAL BROTHERHOOD OF              )
ELECTRICAL WORKERS, FIVE RIVERS           )
ELECTRONICS INNOVATION, LLC, KONKA        )
GROUP CO., LTD., INDUSTRIAL DIVISION OF   )
THE COMMUNICATION WORKERS OF AMERICA,     )
PRIMA TECHNOLOGY, INC.                    )
                                          )
        Deft.-Intervenors                 )
_____ )


OPINION


                            Dated: September 14, 2006

[United States Department of Commerce's Final Determination
sustained in part, remanded in part.]

    *Wiley, Rein & Fielding, LLP* (*Charles Owen Verrill, Jr.*), for
plaintiff.

    *Hunton & Williams, LLP* (*Richard Preston Ferrin* and *William
Silverman*), for plaintiff-intervenors Philips Electronics North
America Corp. and Philips Consumer Electronics Co. Of Suzhou Ltd.

*McDermott, Will & Emery, LLC* (*Raymond Paul Paretzky*), for plaintiff-intervenor TCL Corp.

*O'Melveny & Myers, LLP* (*Veronique Lanthier*), for plaintiff-intervenor Apex Digital.

*Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Jeanne E. Davidson*, Deputy Director, International Trade Section, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Michael David Panzera*); United States Department of Commerce, Office of Chief Counsel for Import Administration (*Marisa Beth Goldstein*), of counsel, for defendant.

*Kelley Drye Collier, Shannon PLLC,* (*Mary Tuck Staley*), for defendant-intervenors Five Rivers Electronics Innovation, LLC; International Brotherhood of Electrical Workers; Industrial Division of the Communication Workers of America.

*White & Case LLP,* (*Adams Chi-Peng Lee*), for defendant-intervenor Konka Group Co., Ltd.

*Willkie, Farr & Gallagher, LLP*, (*Daniel Lewis Porter*), for defendant-intervenor Prima Technology, Inc.


Eaton, Judge:  Before the court is a consolidated action for judgment upon the agency record.[1]  Plaintiff Sichuan Changhong Electric Co., Ltd., ("Changhong" or "plaintiff"), and defendant-

---

[1]     On September 19, 2005, the court ordered the consolidation of *Sichuan Changhong Electric Co., Ltd., et. al., v. United States*, number 04-00265 and *IBEW v. United States*, number 04-00270 under the lead case, *Sichuan Changhong Electric Co., Ltd., et. al., v. United States*, consolidated court number 04-00265.

Prior to consolidation, IBEW, Industrial Division of the Communication Workers of America, and Five-Rivers Electronics Innovation, LLC, were plaintiffs to the action, *IBEW v. United States*, number 04-00270.  Upon consolidation, however, the original plaintiff-parties were designated as defendant-intervenors.

intervenor International Brotherhood of Electrical Workers,

("IBEW" or "defendant-intervenors") et. al., challenge aspects of

the United States Department of Commerce's ("Commerce" or "the

Department") Final Determination of Sales at Less Than Fair Value

and Negative Final Determination of Critical Circumstances:

Certain Color Television Receivers From the People's Republic of

China.  *See* Certain Color Televisions from the People's Republic

of China, 69 Fed. Reg. 20,594 (Apr. 16, 2004) ("Final

Determination"), *as amended by* Notice of Amended Final

Determination of Sales at Less Than Fair Value: Certain Color

Television Receivers from the People's Republic of China, 69 Fed.

Reg. 28,879 (May 19, 2004) ("Amended Final Determination").  The

court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and

19 U.S.C. § 1516a(a)(2)(B)(iii) (2000).  For the following

reasons, the court sustains the Final Determination in part, and

remands it in part.


                              BACKGROUND

    On May 2, 2003, petitioners IBEW, Industrial Division of the

Communication Workers of America ("IUE-CWA"), and Five Rivers

Electronics Innovation LLC ("Five Rivers LLC"), filed an

antidumping duty petition with Commerce alleging that imports of

color television receivers ("CTRs") from the People's Republic of

China ("PRC") were, or were likely to be sold at less than fair

value in the United States.  *See* Pet. for the Imposition of Antidumping Duties (ITA May 2, 2003).  On May 29, 2003, Commerce initiated an antidumping investigation.  *See* Notice of Initiation of Antidumping Duty Investigations: Certain Color Television Receivers from Malaysia[2] and the People's Republic of China, 68 Fed. Reg. 32,013 (May 29, 2003).  The period of investigation ("POI") was October 1, 2002 through March 31, 2003.[3]  *Id.*

On June 16, 2003, Commerce issued antidumping questionnaires to multiple Chinese companies and the Chinese Ministry of Commerce.  Because of the substantial number of respondents, Commerce thereafter chose to limit its investigation to the four largest ("the mandatory respondents"): Changhong; Konka Group Company, Ltd.; Philips Consumer Electronics Co. of Suzhou Ltd. ("Philips"); TCL Holding Company Ltd.; and Xiamen Overseas Chinese Electronic Co., Ltd.  *See generally* 19 U.S.C. § 1677f-1(c)(2) ("If it is not practicable to make individual weighted average dumping margin determinations . . . because of the large

_____

[2]    Although part of the initial investigation, merchandise from Malaysia is not the subject of this consolidated action.

[3]    Pursuant to 19 C.F.R. § 351.204(b)(1)(2005), the POI for an investigation involving merchandise from a nonmarket economy is the two most recent fiscal quarters prior to the month of the filing of the petition, i.e., May 2002.

number of exporters or producers involved in the investigation or

review, the administering authority may determine the weighted

average dumping margins for a reasonable number of exporters or

producers by limiting its examination to . . . exporters and

producers accounting for the largest volume of the subject

merchandise from the exporting country that can be reasonably

examined."). Petitioners thereafter filed their "Critical

Circumstances Allegations" with Commerce, alleging that critical

circumstances[4] existed with respect to imports of CTRs from

Malaysia[5] and the PRC. *See* Letter from Mary T. Staley to Lou

Apple, et. al. of Oct. 16, 2003.


On November 28, 2003, Commerce published its affirmative

preliminary determination. *See* Notice of Preliminary

Determination of Sales at Less Than Fair Value, Postponement of

Final Determination, and Affirmative Preliminary Determination of

---

[4]    A finding of critical circumstances pursuant to 19
U.S.C. § 1673b(e), is an emergency measure to "provide prompt
relief to domestic industries suffering from large volumes of, or
a surge over a short period of imports."  H.R. Rep. No. 96-317 at
63 (1979).  It is designed to deter "exporters whose merchandise
is subject to an investigation from circumventing the intent of
the law by increasing their exports to the United States during
the period between initiation of an investigation and a
preliminary determination by [Commerce]." *Id*; *see Coalition for
the Preservation of Am. Brake Drum and Rotor Aftermarket Mfrs. v.
United States*, 23 CIT 88, 112 n.38, 44 F. Supp. 2d 229, 252 n.38
(1999) (quoting S. Rep. No. 103-412) (1994).

[5]    On April 16, 2004, Commerce terminated its
investigation with respect to Malaysia.

Critical Circumstances: Certain Color Television Receivers from the People's Republic of China, 68 Fed. Reg. 66,800 (ITA Nov. 28, 2003) ("Preliminary Determination").  On April 16, 2004, Commerce published its Final Determination.  *See* Final Determination, 69 Fed. Reg. 20,594.  In its Final Determination, Commerce reaffirmed its finding that all of the Chinese respondents had sold merchandise in the United States at less than fair value.  *Id.*  Commerce also found, however, that "for purposes of the final determination, critical circumstances do not exist with regard to imports of CTVs from the PRC."  *See Id.* at 20,596.


STANDARD OF REVIEW

When reviewing a final determination in an antidumping or countervailing duty investigation, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  "Substantial evidence is more than a mere scintilla."  *Consol. Edison*, 305 U.S. at 229.  The existence of substantial evidence is determined

"by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'"  *Huaiyin*, 322 F.3d at 1374 (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

DISCUSSION

I.   Plaintiff Changhong's Challenges

A.   Commerce's Selection of Infodriveindia Data to Derive
     Surrogate Value for Certain Inputs

The first issue presented for review concerns the valuation of 25-inch Curved Picture Tubes ("CPTs"), and television Speakers ("Speakers").  With the exception of these two inputs, Commerce valued respondents' factors of production, using import statistics published in the Monthly Statistics of the Foreign Trade of India ("MSFTI"), and the World Trade Atlas Trade Information System ("World Trade Atlas").[6]  Although noting that import data from MSFTI was the Department's usual source of surrogate value data, Commerce valued the CPTs and the Speakers using data obtained from Infodriveindia, a fee-based website

---

[6]   These sources compile and disseminate official import statistics collected by the Government of India.  The MSFTI is published by the Directorate General of Commercial Intelligence and Statistics of the Ministry of Commerce and Industry by the Government of India, and is available in the World Trade Atlas. *See* http://www.gtis.com/wta.htm (last visited August 18, 2006).

reporting Indian customs data.  Changhong contests Commerce's use

of this data.[7]


    a.    Relevant Law

In an antidumping investigation, Commerce must determine

whether the subject merchandise is being, or is likely to be

sold, at less than fair value in the United States by comparing

the export price,[8] with the normal value ("NV") of the

merchandise.  *See* 19 U.S.C. 1677b(a).  The NV of subject

merchandise is "the price at which the foreign like product is

first sold . . . for consumption . . . in the usual commercial

quantities and in the ordinary course of trade . . . at the same

level of trade as the export price . . . ."  *See* §

---

[7]    As a producer and exporter of CTRs covered by the
antidumping duty order, Changhong is an "interested party" within
the meaning of 19 U.S.C. § 1677(9)(A), and is thus entitled to
challenge Commerce's determination.  *See* 19 U.S.C. § 1516a(a)(2).


[8]    The statute defines export price as:

> the price at which the subject
> merchandise is first sold (or
> agreed to be sold) before the date
> of importation by the producer or
> exporter of the subject merchandise
> outside of the United States to an
> unaffiliated purchaser in the
> United States or to an unaffiliated
> purchaser for exportation to the
> United States, as adjusted by
> subsection (c) of this section."

19 U.S.C. § 1677a(a).

1677b(a)(1)(B)(i).  It is usually determined by examining sales

of the subject merchandise in the exporter's home market, or in a

third country.  *Id.*


In cases involving exports from a nonmarket economy country

("NME"),[9] however, where "available information does not permit"

the calculation of NV using prices paid for factors of

production, 19 U.S.C. § 1677b(c) instructs Commerce to determine

normal value "on the basis of the value of the

factors of production[10] utilized in producing the merchandise . .

---

[9]     19 U.S.C. § 1677(18)(A) defines a nonmarket economy
country as "any foreign country that the administering authority
determines does not operate on market principles of cost or
pricing structure, so that sales of merchandise in such country
do not reflect the fair value of the merchandise."

In a market economy, prices are generally the result of
competitive forces of supply and demand.  In a nonmarket economy,
however, supply and demand forces do not influence producers'
business decisions to the same extent. Costs, prices and
allocation of resources are frequently determined by government-
controlled entities, without regard to market forces.  As a
result, NME prices do not reflect the fair value of the
merchandise. *See Georgetown Steel Corp. v. United States*, 801
F.2d 1308, 1315 (Fed. Cir. 1986).

[10]     The factors of production used in producing the subject
merchandise include, but are not limited to: (1) hours of labor
required; (2) quantities of raw materials employed; (3) amounts
of energy and other utilities consumed; and (4) representative
capital cost. *See* § 1677b(c)(3).  Subsection 1677b(c)(1) further
directs Commerce to add to this value, an amount for general
expenses and profit plus the cost of containers, coverings, and
other expenses. *See* § 1677(b)(c)(1).

. ."[11]  § 1677b(c)(1). In most investigations involving NMEs, the factors of production are valued using surrogate values from a market economy country.  *See Shakeproof Assembly Components, Div. Of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001).  The Federal Circuit, however, has recognized that surrogate country values are "at best, an estimate" of "what a non-market economy manufacturer might pay in a market-economy setting."  *See id.* at 1382 (citing *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1445–46 (Fed. Cir. 1994)).

Section 1677(b)(c) further requires that the valuation of factors of production "be based on the best available information regarding the values of such factors in a market economy country . . . ."  § 1677(b)(c)(1).  The words "best available information" are not statutorily defined.  *See Allied Pac. Food (Dalian) Co., Ltd. v. United States*, 30 CIT __, __, 435 F. Supp. 2d 1295, 1313 (2006) ("Congress did not define the term "best available information" . . . [however,] [t]he Department's exercise of discretion . . . must be guided by the larger purpose of the antidumping law.  The [Tariff] Act sets forth procedures

---

[11]    Commerce has treated the PRC as an NME in all past antidumping investigations.  *See, e.g.*, Final Determination of Sales at Less Than Fair Value and Critical Circumstances: Certain Malleable Iron Pipe Fittings From the People's Republic of China, 68 Fed. Reg. 61,395, 61,396 (ITA Oct. 28, 2003).  A country's designation as an NME remains in effect until it is revoked by the Department.  *See* 19 U.S.C. § 1677(18)(c)(i).

in an effort to determine margins as accurately as possible. ")

(internal citations and quotations omitted).  Commerce's exercise

of discretion is, of course, subject to judicial review.  Where a

question arises concerning the time period from which surrogate

prices have been obtained, this Court has found:

> While accuracy is of utmost importance, 19
> U.S.C. § 1677b(c) fails to indicate the time
> periods from which surrogate values are
> supposed to be taken.  This court, however,
> has repeatedly recognized that Commerce's
> practice is to use surrogate prices from a
> period contemporaneous with the period of
> investigation.  Accordingly, while the
> standard of review precludes the court from
> determining whether Department's choice of
> surrogate values was the best available on an
> absolute scale, the court may determine the
> reasonableness of Commerce's selection of
> surrogate prices.

See Citic Trading Co. Ltd. v. United States, 27 CIT __, __, slip

op. 03-23 at 16 (Mar. 4, 2003) (not published in the Federal

Supplement)(footnotes omitted).


     b.   Commerce's Valuation of 25-inch CPTs

     As an initial matter, Changhong argues that Commerce has

"explicitly rejected the use of Infodriveindia as a source of

information" in other investigations.  Br. Pl. Sichuan Changhong

Electronic Co., Ltd. Supp. Rule 56.2 Mot. J. Ag. Rec. ("Pl.'s

Br.") at 8.  In response, the Department insists that "simply

because Commerce determines not to use a particular data source

in one administrative proceeding does not preclude it from using that same data source in another administrative proceeding involving a different product and a different administrative record."  Def.'s Mem. Opp. Mot. For J. Ag. Rec. ("Def.'s Resp.") at 15.  Commerce further maintains that "selection of a data source in a particular determination" does not "constitute[] a 'practice' forever binding Commerce to use that data source or requiring explanation to justify use of any other data source." *Id.* at 15.

Here, plaintiff has produced no evidence demonstrating that Commerce has an established practice of not using Infodriveindia data.  *See Ranchers-Cattlemen Action Legal Fund v. United States*, 23 CIT 861, 884-85 74 F. Supp. 1253, 1374 (1999)("An action . . . becomes an 'agency practice' when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure.").  Therefore, while Commerce may have passed up opportunities to use Infodriveindia information in the past, this alone is not a bar to its use to value CPTs in this case.

Next, Changhong argues that Commerce erred in its use of the

Infodriveindia data because there is "no sound reason" for Commerce's departure from, what Changhong characterizes as, its "past practice of using official [MSFTI] import statistics as the basis for surrogate values for 25-inch CPTs."  Pl.'s Br. at 7. In support of its position, Changhong contends that not only has Commerce consistently used MSFTI data in past determinations, but it has used these statistics "even where the import categories involved were basket categories containing a range of items." *Id.* at 9-10.  It further argues that Commerce should have valued all CPTs using a single value derived from merchandise imported under Indian HTS number 8540.11.00, which it claims is "not even truly a basket category as it contained only color picture tubes," and is therefore specific to the input to the 25-inch CPTs.  Pl.'s Br. at 11.  The court finds Changhong's contentions unconvincing.

As an initial matter, despite Changhong's arguments to the contrary, information on the record indicates that Indian HTS category 8540.11.00 includes not only 25-inch curved CPTs, but also other types of picture tubes in other sizes.  *See* Pet.'s Addt'l Factual Info. ("IBEW Submission") at 24.  A review of MSFTI data indicates that reported within category 8540.11.00, are values reflecting curved and flat-screened, 14, 21, 24, 28,

and 29-inch CPTs, none of which are within the scope of this investigation.  *See id.* at Attachment 3 (listing CPT import data for category 8540.11.00).  Indeed, an examination of this data reveals that the majority of imports under HTS number 8540.11.00 are of 14-inch and 21-inch CPTs.  *Id.*  Thus, Changhong's proposed source is not specific to the merchandise at issue.

The Infodriveindia data, on the other hand, was disaggregated into individual imports of specific size and type of color picture tube.  *See* Factors Valuation Mem. at Attachment 3 (displaying size-specific and type-specific examples of Infodriveindia data for 29-inch flat CTRs).  Commerce explained that the product specificity of the data for this input was particularly important in its source selection "because, as Changhong concedes, color picture tubes . . . are important parts of color televisions, and they constitute a [significant] percent of the total value of materials used to produce televisions." Def.'s Resp. at 18 (citing Pl.'s Br. at 8.).

In addition, although the Department maintains preferences for using particular data sources, courts have held that no one source will always provide the best available information.  *See Peer Bearing Co. v. United States*, 22 CIT 472, 480, 12 F. Supp.

2d 445, 455 (1998) ("Although Commerce expresses a strong preference for obtaining all factor values from a single surrogate source, both case law and Commerce's determinations are filled with instances in which Commerce used a blend of sources and surrogates to determine FMV."). Thus, Commerce is not bound by its preference for a particular source, rather its charge is to use the best available information. Based on the foregoing, the court finds reasonable Commerce's preference for Infodriveindia data because that information was more product and size specific than that preferred by plaintiff.

Next, Changhong contends that the Infodriveindia data "was unreliable because Commerce lacked such basic information as: where Infodriveindia obtained the underlying data; how the information was collected; what was included and what was left out," *inter alia*. *See* Pl.'s Br. at 14.

Plaintiff's contentions lack merit. First, to verify the reliability of the data collection and the authenticity of the information,[12] Commerce contacted Infodrive India Pvt. Ltd., the

---

[12]    After a petitioner [[     ]] submitted a proposal to use import statistics from Infodriveindia to derive surrogate values, Changhong argued that the source was unreliable. *See* IBEW Oct. 6, 2003 Submission at 4, 10; Changhong Nov. 6, 2003 Submission at 9.

company responsible for maintaining the Infodriveindia website.
Following this inquiry, the Department placed on the record, e-
mail correspondence between one of its analysts and a
representative from Infodriveindia, reflecting that the company:
"(1) obtains the information in question from official Indian
customs data; (2) receives daily customs data transmitted each
month from the Indian customs department; and (3) presents the
Indian customs data exactly as it is received, without additions
or deletions."  *See* Issues & Decision Mem. at 43.[13]  Plaintiff
has made no showing that seriously calls these representations
into question.  Thus, the court finds that Commerce has

---

[13]     An example of the content of these emails is as
follows:

> 1)     Does the information on infodriveindia
>        consist of any other source besides
>        official import statistics from the
>        Indian government (i.e., customs)? . . .
>
>        No this covers only official source. . . .
>
>   2) Do you delete/omit any information from the data
>        you receive from Indian customs before making it
>        available on your website? . . .
>
>        We don't delete and add any information which
>        Indian Gov't Publishes, we relicate [sic] exactly
>        the same information.

Memo to File regarding "Placing Information on the Record
Regarding Infodriveindia in the Antidumping Duty Investigation on
Color Television Receivers from the People's Republic of China"
("Infodriveindia Verification Letter) at 1-2.

adequately addressed Changhong's initial allegations of
unreliability.

Plaintiff next objects to what it calls the "unreliability
of the Infodriveindia data . . . [that] is highlighted by the
mystery regarding the country of origin of the tubes in question.
For 25" curved tubes . . . 538 of the 858 units reported by
Infodriveindia were shown as coming from Austria and France.  Yet
. . . there was no production of curved picture tubes in either .
. . countr[y]."  Pl.'s Br. at 14.  Commerce, however, insists
that the country of origin is not relevant to its inquiry.
Rather, what matters for Commerce is that the CPTs were the
subject of a market economy sale.  The Department cites 19 C.F.R.
§ 351.408 to bolster its argument.  *See* 19 C.F.R. § 351.408(c)(1)
("[W]here a factor is purchased from a market economy supplier
and paid for in market economy currency, the Secretary normally
will use the price paid to the market economy supplier.").  Thus,
for Commerce, § 351.408(c)(1) directs the use of prices derived
from market economy transactions, not that the merchandise be
produced in a market economy country.  *See Polyethylene Retail
Carrier Bag Comm. v. United States*, 29 CIT __, __, slip. op. 05-
157 at 47 (Dec. 13, 2005) (not published in the Federal
Supplement) ("In past cases, Commerce has interpreted 19 C.F.R. §

351.408(c)(1) as not disqualifying transactions based on the goods' country of origin."). On this record it is reasonable to assume that any price anomaly resulting from a sale by a nonmarket economy producer in its home country has been corrected by the subsequent market economy sale. Commerce was, therefore, within its discretion in finding that even if Austria and France did not produce CPTs, because they are market economy countries, imports into the United States that have been the subject of a sale in these countries are legitimate sources of surrogate value data. Issues & Dec. Mem. at 51.

Changhong further contests the reliability of the Infodriveindia data claiming that "none [of it] concerned imports during the [POI]," and that the "imports reported by Infodriveindia entered India up to eight months before the beginning of the investigation." Pl.'s Br. at 16 ("All of the information upon which Commerce relied for surrogate values for 25" curved picture tubes was dated before the period of investigation.").

In defense of its findings, Commerce states that it considered it sufficient that the Infodriveindia data was "contemporaneous," or from "a period very close to the beginning or end of the [period of investigation] . . . ." Def.'s Resp. at

21 (citing to Issues & Decision Mem. at 51).  Specifically,
Commerce states that "the Infodriveindia data reflected data
beginning six months[14] before the start of the [POI], but ending
one month before the close of the POI."

Although the Department states that there was near
contemporaneity between the POI and the data contained in
Infodriveindia, it does not point to any record evidence
supporting its claim – nor has the court found any.  In order for
the court to assess Commerce's statements as to contemporaneity,
it must examine record evidence supporting them.  Here, so far as
can be determined, absent from the record is any evidence
indicating if the Infodriveindia data fell within, or near the
POI.  On remand, Commerce must provide record evidence indicating
when the imports reported in the Infodriveindia data entered
India.  If indeed the imports entered before the beginning of the
POI, and Commerce wishes to continue to rely on these values, it
must explain how this information is most contemporaneous with
the POI, or why the non-contemporaneity is outweighed by other
aspects of the data making it the best available information.

---

[14]   Defendant itself is unclear as to whether the data is
six, seven, or eight months before the POI.  While in its
response defendant claims that the data is six months before the
POI, Commerce, in its Issues and Decision Memorandum, indicates
that the data is seven months before the POI.  Neither document
provides any citation establishing the actual dates for the
information.

*See Int'l Imaging Materials, Inc. v. United States*, 30 CIT __, __, slip op. 06-11 at 13 (Jan. 23, 2006) (not published in the Federal Supplement) ("[An] agency must explain its rationale . . . such that a court may follow and review its line of analysis, its reasonable assumptions, and other relevant considerations.")(quoting *Allegheny Ludlum Corp. v. United States*, 29 CIT __, __ 358 F. Supp. 2d 1334, 1344) (2005) (alterations in original)) .

Changhong also contends that the Infodriveindia data did not reflect "usable commercially significant entries," and thus was unreliable.  Pl.'s Br. at 15.  The Infodriveindia data at issue consisted of four entries, comprised of sales of 858 units.  *See* Prelim. Factors Mem. at Attachment 6.  In response to plaintiff's assertions, Commerce's sole argument is that "there is no information on the record . . . to show that the quantities shown in the Infodriveindiadata do not represent commercial quantities."  Issues & Decision Mem. at 51.

The Court has previously found that Commerce can rely on import statistics as a basis for surrogate values only "after [reasonably] concluding that [the import statistics] are based on commercially and statistically significant quantities." *Polyethylene*, 29 CIT at 43 (internal quotations and citations

omitted).  While Commerce has stated its conclusion, it has neither explained why its conclusion is reasonable, nor supported its conclusion with record evidence.   In order to rely on the Infodriveindia statistics, on remand, Commerce must point to record evidence supporting its conclusion that the quantities shown in the Infodriveindia data represent commercial quantities, and explain why its conclusion is valid.  *See, e.g., Shanghai Foreign Trade Enters. Co. v. United States,* 28 CIT __, __, 318 F. Supp. 2d 1339, 1352–53 (2004).

c.    Commerce's Valuation of Speakers

Changhong also contests Commerce's valuation of Speakers using the Infodriveindia data.  In reaching its determination, Commerce placed on the record surrogate value information for Speakers obtained from Infodriveindia for September 2002 and April 2003 ("March 17th Infodriveindia data").  Commerce invited, and Changhong submitted, comments on the use of this information. *See* Issues & Decision Mem. at 57.  Changhong and other Chinese producers subsequently placed four invoices for purchases of Speakers by television producers in India on the record.  *See* Issues & Decision Mem. at 57–58.  Changhong urged Commerce to rely upon its January 2003 invoice submission as the best available information as to price.  In an ancillary argument, plaintiff further insists that the invoice is the best available information because the January 2003 invoice is within the POI.

*See* Pl.'s Br. at 19-20.  This invoice reflected the sale of

100,000 speakers[15] by an Indian company, Woodstock Electronics,

to Philips, a producer of color televisions in both India and

China in a purchase unrelated to the present investigation.  *See*

Pl.'s Br. at 18 (citing Changhong Final PAI Submission, at 5 and

Exhibit 5).  The date of the invoice was January 8, 2003; within

the October 1, 2002 – March 31, 2002 POI.  *Id.*


In its Final Determination, Commerce considered Changhong's

alternative data source, but concluded that it has a "clear

preference to use publicly-available prices, as opposed to

specific price quotes (or invoices), unless there is evidence on

the record of the [specific price quotes/invoices] demonstrating

that the input used in the production of subject merchandise is

of a specific type, which would not be accurately represented by

the more public data."  Issues & Decision Mem. at 62 (citing PVA

from the PRC at Comment 5).  The Department then stated that it

relied upon the Infodriveindia data because it was "publicly-

available, representative of a range of prices, non-export

values, and tax-exclusive."  *Id.*  Commerce concluded that "this

data represents the best information available for speakers," and

_____

    [15]    According to plaintiff, the largest quantity of units
reported in Infodriveindia was 9,000 units.  During the POI,
Changhong produced [[        ]] units of the subject CTVs for
export to the United States alone.  *See* Pl.'s Br. at 20.

further found "no persuasive evidence on the record demonstrating that the speakers shown on Changhong's invoices are more representative of the speakers used by the respondents than those referenced in the Infodriveindia data." *Id.* at 63, 62.  Commerce also considered Changhong's POI argument, weighed this aspect of the proposed data source, but found it outweighed by the fact that it was not publicly available and not indicative of the industry as a whole.

In its response, Commerce reiterates its preference for publicly-available prices by referencing the following language contained in 19 C.F.R. § 351.408(c)(1): "The Secretary normally will use publicly available information to value its factors." The next sentence of this provision further provides: "However, where a factor is purchased from a market economy supplier and paid for in a market economy currency, the Secretary normally will use the price paid to the market economy supplier."  19 C.F.R. § 351.408(c)(1).  The import of this provision is that, when a respondent itself makes a market economy purchase of an actual input, that price is to be preferred as the best available information.  Here, however, Changhong merely placed upon the record a non-public invoice for a market economy purchase consummated between strangers to plaintiff's transactions.

The Court has consistently sustained Commerce's preference for publicly-available information representative of the industry norm.  *See Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 28 CIT __, __, slip. op. 04-109 at 12, (Aug. 20, 2004) (not published in the Federal Supplement) (affirming Commerce's selection of surrogate data because it represented, *inter alia*, published, publicly-available data); *see also Peer Bearing Co.,* 25 CIT at 1217, 182 F. Supp. 2d at 1307 ("Commerce's goal is to use surrogate values that represent the industry norm of the surrogate country, not company-specific surrogate values. . . ."right).  The invoice submitted by Changhong is representative only of the price paid by a single producer, and has not been shown to be indicative of the entire industry.  *See Zhejiang*, 28 CIT at __, slip. op. at 12 (sustaining Commerce's decision to "reject the . . . price calculated from [the processor's] financial statement, on the grounds that the value for [the subject merchandise] represents the value . . . as experienced by a single processor [of the subject merchandise] in a particular region of India.").  Commerce was, therefore, justified in not considering plaintiff's proffered data as sufficient to constitute the best available information, when it had available public information representing a range of prices and transactions.  *See, e.g., See Polyethylene Retail Carrier Bag*

*Comm. v. United States*, 30 CIT __, __, slip. op. 06-94 at 8-9 (June 21, 2006) (not published in the Federal Supplement).


   B.   Commerce's Determination to Disregard Certain Market
        Economy Purchases from Korea and Thailand

The next issue before the court is whether Commerce erred in disregarding Changhong's market economy purchases of certain inputs used in the production of its CTVs.  In Changhong's Third Supplemental Response, it stated that it had purchased numerous inputs from the market economy countries of Korea and Thailand, and that therefore, prices paid for these inputs should be used to value the factors of production.  *See* Pl.'s Br. at 24 (citing Supplemental Response, at Exhibit SD3-1).  Although Commerce may rely on surrogate values, its regulations provide that values based on actual purchases made by a respondent from market-economy suppliers, paid for in market economy currency, are to be preferred in valuing the factors of production.  *See* 19 C.F.R. § 351.408(c)(1).  Thus, in its Preliminary Determination, Commerce indicated that, in valuing inputs purchased from market economy suppliers, in most circumstances, it would use the actual price paid for these inputs.  *See* Preliminary Determination, 68 Fed. Reg. 66,807-08.  Commerce also stated, however, that where it has reason to believe or suspect that the price of an input is subsidized, it would select a surrogate value rather than use a price that might be distorted.  *See* 19 U.S.C. § 1677b.  As a

result, in its calculations, the Department declined to use
Changhong's market economy purchase prices for inputs purchased
from Korea and Thailand because it found that those countries
maintained broadly-available, non-industry specific subsidies.
*See* Issues & Decision Mem. at 36–37.  In its Final Determination,
Commerce affirmed its position.  *See id.* at 38 (stating that
Commerce will disregard market economy purchases where they were
made from "countries [that] maintain broadly-available, non-
industry-specific subsidies which may benefit all exports to all
export markets.").

Changhong argues that in declining to use its purchases from
the market economy countries of Korea and Thailand in the
calculation of normal value, Commerce did not act in accordance
with the precedent of this Court, or Commerce's own practices.
*See* Pl.'s Br. at 25–27.  Specifically, Changhong argues that
Commerce may disregard purchases made in market economy countries
only if there is "particularized evidence showing that the prices
paid . . . have been distorted by subsidies," and that the record
did not support such findings in this case.  *Id.* at 25.  In
support of this claim, plaintiff cites *Fuyao Glass Industrial
Group Co., Ltd. v. United States*, 27 CIT __, __, slip op. 03-113
(Dec. 18, 2003) (not published in the Federal Supplement)("*Fuyao
I*"), and *Fuyao Glass Industrial Group Co. v. United States*, 30
CIT __, __ slip op. 05-06 (Jan. 25, 2005) (not published in the

Federal Supplement) ("*Fuyao II*").  *Id.* at 25-28.


The "reason to believe or suspect" standard first appeared in the legislative history for 19 U.S.C. § 1677b, which states that "in valuing such [nonmarket economy] factors, [Commerce] shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices."  *See* Omnibus Trade and Competitiveness Act of 1988, H.R. Conf. Rep. No. 100-576 at 590 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1623.


In *Fuyao II*, the Court found that Commerce has a reason to believe or suspect that an input may be subsidized if it can demonstrate by specific and objective evidence that:

> (1) subsidies of the industry in question
> existed in the supplier countries during the
> period of investigation ("POI"); (2) the
> supplier in question is a member of the
> subsidized industry or otherwise could have
> taken advantage of any available subsidies;
> and (3) it would have been unnatural for a
> supplier to not have taken advantage of such
> subsidies.

*Fuyao II*, 29 CIT at __, slip op. 05-6 at 10.  Commerce purported to apply this three-prong test in declining to use Changhong's market economy purchases.  *See* Def.'s Resp. at 26 ("[I]n accordance with *Fuyao*, Commerce placed upon the record 'particular, specific, and objective evidence' of generally-available non-specific export subsidies that the Thai [and]

Korean . . . governments provide all exporters, regardless of the

product.").


        Commerce's justification[16] for excluding the market economy

purchases consists of selected portions of the *Fuyao Glass* Remand

Determination listing the export subsidy programs it found to be

available in Korea and Thailand: "For Korea the identified

programs include: Duty Drawback, Export Credit and Short-Term

---

        [16]    Commerce also relied upon what it calls its general
policy, and a supporting memorandum, for disregarding subsidized
factor input prices from Korea and Thailand.  *See* Issues &
Decision Mem. at 36-37; *see also* Def.'s Resp. at 25-27.  In its
Issues and Decision Memorandum, Commerce stated that it has a
general policy of not including prices paid for inputs from Korea
and Thailand because it has reason to believe or suspect that
those countries maintain subsidy programs which distort export
price.  *See* Issues & Decision Mem. at 36.  As a basis for this,
Commerce pointed to a February 2002, memorandum entitled, "NME
Investigations: procedures for disregarding subsidized factor
input prices."  *Id.*  Therein, Commerce stated the policy advising
that for "all non-market economy investigations, factor input
prices from Korea, [and] Thailand . . . should be disregarded . .
. .  Each of these countries maintain broadly available, non-
industry specific export subsidies.  In prior decisions, we have
found that the existence of these subsidies provides sufficient
reason to believe or suspect that export prices from these
countries are distorted."  *Id.*  The policy relied upon by
Commerce includes general findings regarding broadly available,
non-industry specific export subsidies in the countries, but does
not explain the findings in any way.

        The court notes that Commerce's reliance on this general
policy in the context of a lawsuit is misplaced.  This "general
policy" does not provide the court with the specific and
*objective* evidence necessary for Commerce to meet its burden.
Indeed, Commerce's findings based on its policy appear to suffer
from the infirmities identified in *Fuyao*.  *See e.g.*, *Fuyao II*, 29
CIT at __, slip op. 05-6 at 22.

Export Financing programs.  For Thailand, the identified programs include: Export Packing Credits, Duty Exemption for Raw Materials, and Tax Certificate for Exporters subsidy programs." *See* Def.'s Resp. at 37 (citing *Fuyao Glass* Remand Redetermination at 29-32)(indicating that "[b]ecause this list equally applies here, we have placed it on the record of the instant investigation.") (internal citations omitted).  A corresponding memorandum is also referenced, in which Commerce provided a brief description of each of the listed programs.  *See, e.g.,* Memorandum from Elizabeth Eastwood, Placing Information on the Record Regarding Subsidy Programs In the Investigation of Certain Color Television Receivers from the People's Republic of China (Apr. 12, 2004) (P.R. 544) ("Eastwood Memorandum") at 29.[17]

---

[17]     An example of the information provided in Commerce's memorandum regarding the Korean subsidy program is presented in full:

> 1) Korea
>     Among the many Korean subsidy programs listed were Duty Drawback on Non-Physically Incorporated Items and Excessive Loss Rates ("Duty Drawback"), Export Credit Financing from the Export Import Bank of Korea ("Korean Export Credit"), and Short-Term Export Financing.
>
>     The Duty Drawback subsidy program is described in part, as: "The Government of Korea establishes an authorized loss rate for raw materials used in the manufacture of exported goods. . . . The Government of Korea reduces the amount of duty drawback received on the exported product to account for the sales of by-products produced from the excess

Assuming that Commerce is able, on remand, to satisfy

prong-1 of the *Fuyao* test, the court finds that Commerce has

provided sufficient evidence to meet prong-2 of the test, i.e.,

"the supplier in question is a member of the industry or

otherwise could have taken advantage of any available subsidies."

*See Fuyao II*, 29 CIT at __, slip op. 05-6 at 10.

---

raw materials used in the production of
exported goods."

The Export Credit program is described,
in part, as: "The National Investment Fund
(NIF), which was established by the
Government of Korea in 1973, is a source of
funds for banks to loan.  NIF funds are used
to finance development or to finance exports
on a deferred payment basis . . .  Because
the loans are contingent upon export and the
rates of interest charged are less than that
on comparable financing, these loans confer
benefits which constitute export subsidies."

The Short-term Export Financing program
is described, in part, as: "Under Article 16
of the Tax Exemption and Reduction Control
Act (TERCL), a domestic person engaged in a
foreign currency earning business can
establish a reserve amounting to the lesser
of one percent of foreign exchange earnings
or 50 percent of net income for the
respective tax year. . . . This program
constitutes an export subsidy because the use
of the program is contingent upon export
performance.

*See* Eastwood Mem. at 29–30 (omissions in original).  Similar

descriptions were also included for Thailand.  *See id.* at 30–32.

In the Eastwood Memorandum, Commerce pointed to record evidence indicating that the programs listed were non-product specific and non-industry specific. *See* Eastwood Mem. at 31, 32 ("None of these programs in any of these three countries are specific to any particular type of product. . . . Further, each of these programs are available to any company engaged in export activities."). The contents of the memorandum, i.e., the listed subsidy programs and their description and corresponding explanation, are sufficient to demonstrate that the supplier in question could have taken advantage of available subsidies. In other words, because the described subsidy programs were non-industry specific, they fulfill the requirements of prong-two.

Although being generally available and non-industry specific provides some support of Commerce's reasonable belief or suspicion that the inputs may be subsidized in the instant matter, this information alone is insufficient to demonstrate the specific and objective evidence that the inputs may have been subsidized.

First, Commerce has failed to show that the subsidies existed in the supplier countries during the period of investigation, as is demanded by prong one. Instead, Commerce has established the existence, at some point in time, of the

subsidy programs in the subject countries.  With respect to Korea, Commerce indicated only that certain of the subsidy programs were established prior to the POI.  *See, e.g., id.* at 30 ("The National Investment Fund (NIF) . . . was established by the Government of Korea in 1973 . . . .").  No date information at all was provided as to Thailand.  *Id.*  It is simply not reasonable to assume that subsidy programs, once established, exist in perpetuity.  Because Commerce failed to indicate that the subsidies existed during the October 1, 2002 - March 31, 2003 POI, it did not provide the specific and objective evidence required under prong-one of the *Fuyao* test.

Second, the court finds that Commerce failed to establish the third-prong of the *Fuyao* test.  The third prong requires a relatively minimal showing by Commerce, i.e., that it "would have been unnatural for a supplier not to have taken advantage of any available subsidies."  *See Fuyao II*, 29 CIT at __, slip op. 05-6 at 10.  Previously, this Court has found this prong satisfied by a showing of "the competitive nature of market economy countries."  *Id.* at 24.  Contrary to Commerce's insistence, however, the burden with respect to this finding is not on plaintiff.  *See* Def.'s Resp. at 25 ("[T]he burden shifts to the respondent to demonstrate that the supplier did not take advantage of those subsidies.").  Indeed, prong three of the

*Fuyao* test specifically requires that "Commerce must demonstrate by specific and objective evidence that . . . it would have been unnatural for a supplier to not have taken advantage of such subsidies."  *Fuyao II*, 29 CIT at __, slip op. 05-06 at 10.  In the instant matter, Commerce has failed to do so.

Accordingly, the court finds that Commerce's determination not to include prices for inputs purchased by Changhong from Korea and Thailand in the calculation of normal value, was unsupported by substantial evidence.  The court remands this issue to Commerce with instructions to either use the prices for inputs purchased from Korea and Thailand, or if it continues to find that it has reason to believe or suspect that these prices may be subsidized, to search the record for further probative evidence; or to re-open the record and do a literature search[18] to provide, if possible, additional evidence to support its conclusions that: (1) the generally available subsidies were in effect during the POI; and (2) it would be unnatural for a supplier not to take advantage of these subsidies.

---

[18]    Commerce is not required to conduct a full-scale investigation to determine that prices are subsidized.  *See Peer Bearing Corp. v. United States*, 27 CIT __, __ 298 F. Supp. 2d 1328, 1337 (2003)("[T]he statute does not require Commerce to conduct a formal investigation.").  Indeed, Commerce need only conduct a search using the reference materials available to it.

    C.   Commerce's Computation of Financial Ratios

    The next issue before the court involves Changhong's
challenge to Commerce's calculation of the financial ratios used
to determine normal value.


    First, Changhong disputes Commerce's removal of "Managerial
Remuneration" from the calculation of one of its relied upon
financial ratios.  *See* Pl.'s Br. at 39.  As previously discussed,
in constructing normal value in the NME context, Commerce
typically employs surrogate values.  *See* § 1677b(c)(1).  When
relying on surrogate values, Commerce calculates financial ratios
for the surrogate companies for the purpose of constructing
normal value.[19]  *Id.*  In the Final Determination, Commerce
removed values for Managerial Remuneration from one of the
financial ratios' denominators.[20]  *See* Pl.'s Br. at 39.

---

[19]    Once Commerce calculates these ratios, the results are
used in a formula aimed at deriving normal value.  Specifically,
    [f]inancial ratios are used to determine overhead, financial
    and selling, general and administrative factors ("E"). The
    denominator consists of the surrogate's material, labor, and
    energy costs ("Y"). Consequently, if $(1/Y \times (surrogate\ value)) = E$, and $(E + (surrogate\ value)) = normal\ value$
    ("NV"), then the greater Y is, the smaller NV becomes.

*Anshan Iron & Steel Co., Ltd. v. United States*, 27 CIT __,
slip op. 03-83 at 15 n.5 (July 16, 2003) (not published in the
Federal Supplement).

[20]    In its Final Determination, Commerce also removed
certain values for "Sitting Fees to Directors," and "Remuneration
to Directors." *See* Final Determination Factors Mem. at Attachment
                                                  (continued...)

Changhong challenges the adjustment to Managerial Remuneration on two separate grounds.  *Id.*

Plaintiff initially claims that Commerce erred by failing to refer to the source from which it derived the subtracted amount. *Id.* at 39-40 (Commerce has not indicated "where in any of the schedules the value can be found to have been reported.").  It insists that Commerce's "adjustment for Managerial Remuneration does not appear in any of the schedules, the [surrogate] company's income statement, statement of cash-flows, or balance sheet.  Instead, Commerce appears to have plucked the value from a table . . . ."  *Id.* at 39-40.

Changhong further insists that Commerce made the adjustment but "provided no justification for why the total value . . . was subtracted from the calculation [of the financial ratio]." *Id.* at

_____

[20](...continued)
5 (BPL calculation) (P.R. 545); *see also* Pl.'s Br. at 39.

Changhong, however, does not contest the source of the value used for the adjustment to Director's Remuneration.  Rather, it states that "Commerce identified the removal of the line item for director's remuneration and referred to the particular schedule where the . . . value [used] was obtained."  *See* Pl.'s Br. at 39. This action taken by Commerce is precisely what Changhong maintains as error with respect to managerial remuneration.

Similarly, Changhong does not dispute the adjustment to "Sitting Fees to Directors."  *See id.* at 39-40.

40.  In other words, Changhong maintains that Commerce provided no explanation for the amount of its adjustment.

Finally, Changhong alleges that Commerce's calculation of its financial ratios resulted in double-counting.  *See id.* at 39-40.  Plaintiff asserts that Commerce's calculation does not properly reflect that "gross remuneration for certain of the [surrogate] companys' management may include items such as certain managers' compensation as members of [the surrogate companys'] board of directors."  *Id.* at 40.  Because "at least three" of the surrogate companys' managers also sit on the board of directors, Changhong insists that "it is likely" that the value for total executive compensation used by Commerce erroneously "includes not only managerial pay, but also director's pay."  *Id.*  This, Changhong maintains, "represents a double counting of total executive compensation."  *Id.*

Commerce's sole argument in opposition to Changhong's claims is that it is too late in raising its objections.  Thus, it disagrees with plaintiff's characterization of its allegations.  *See* Def.'s Resp. at 31-33.  The Department contends that Changhong is not attacking its methodology, but rather is raising ministerial errors in the application of its methodology.  *Id*. at 33.  Commerce insists that any adjustments made (or not

made) to its calculations were due to inadvertent clerical

errors.  *Id.*  Accordingly, it maintains that, because plaintiff's

claims were not raised at the agency level, they were waived.

*See id.* (citing 28 U.S.C. § 2637(d))[21] ("Changhong chose not to

object to the deduction of managerial remuneration from labor, or

raise how managerial remuneration could overlap with directors'

remuneration or sitting fees, as a ministerial error.").


A ministerial error is "an error in addition, subtraction,

or other arithmetic function, clerical error resulting from

inaccurate copying, duplication, or the like, and any other

similar type of unintentional error which the Secretary considers

ministerial."  19 C.F.R. § 351.224(f) (2004); *see also* 19 U.S.C.

§ 1671d(e).  The Federal Circuit has defined the term "clerical

error" to be an error that "by [its] nature [is ] not [an] error

in judgment but merely [an] inadvertenc[y]."  *NTN Bearing Corp.*

*v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).  Were all

of plaintiff's challenges related solely to ministerial error

claims, they should have been raised within a reasonable time at

the agency level.  Any such claims not raised within a reasonble

time during the investigation would be waived.  *See generally*

*IPSCO Inc. v. United States*, 965 F.2d 1056, 1062 (Fed. Cir. 1992)

---

[21]     "[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d).

(citing H.R. Rep. No. 40, 100th Cong., 1st Sess., pt. 1 at 144

(1987) ("This provision allows for the correction of ministerial

errors in final determinations within a limited time period after

their issuance. . . . [As such, the court finds that] appellant

did not raise the alleged error within a reasonable time after

the original final determination.").

To the extent that Changhong objects to Commerce's failure

to provide the source from which it derived the subtracted

amount, it makes a clerical, and thereby ministerial error claim.

*See* 19 C.F.R. § 351.224(f).  Indeed, Commerce's failure to point

to the table or schedule reflecting the subtracted value is

properly viewed as an inadvertency.  Because Changhong did not

raise this claim within a reasonable time, it was waived pursuant

to 19 U.S.C. § 1671d(f).

Changhong, however, does not take issue solely with

Commerce's clerical errors; it additionally claims that Commerce

provided no rationale for excluding certain values from the

ratios, and that double counting may have been included in

Commerce's remuneration calculation.  The court finds that both

of these objections go to the methodology[22] employed by Commerce,

---

[22]     It is possible that plaintiff's double counting claim
could have been corrected as a ministerial error at the agency
                                              (continued...)

and thus are not waived.  *See Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 CIT __, __, slip. op. 04-88 at 18 (July 19, 2004) (not published in the Federal Supplement) ("With regard to the methodology Commerce uses to resolve an issue, the exhaustion doctrine is inapplicable where a respondent did not have the opportunity to challenge the methodology because Commerce failed to articulate the methodology . . . .").  In the first instance Changhong claims error in Commerce's failure to explain why it made the adjustments; and secondly, Changhong contests Commerce's methodology itself, i.e., why it took action that might lead to double counting.  Both of these claims involve a challenge to Commerce's judgment.  As such, Changhong's challenges are not to ministerial errors, but to Commerce's methodology.  Because these claimed errors were first raised in its Motion for Judgment Upon Agency Record, Changhong had no opportunity to challenge them at the administrative level and so it is proper for this Court to hear them.  *See Carpenter Technology Corp. v. United States*, 30 CIT __, slip op. 06-134 (Sept. 6, 2006) (not published in the Federal Supplement).

It is apparent that Commerce has not articulated its

---

[22](...continued)
level.  However, since Commerce makes no effort to explain its actions, the court finds that they were the result of its methodology.

methodology with respect to the calculation of the financial

ratios.  The United States Supreme Court has "frequently

reiterated that an agency must cogently explain why it has

exercised its discretion in a given manner."  *See Motor Vehicle*

*Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48

(1983).  Accordingly, the issue of financial ratios is remanded

to Commerce with instructions to clearly set forth the

methodology used in the Final Results, and to justify its

conclusions.  *See Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737

(D.C. Cir. 2001).


      D.    Commerce's Determination Not to Exclude Values for
           Small Quantities of Imports

In its Preliminary Determination, with the exception of two

inputs,[23] Commerce valued respondents' factors of production,

using import statistics published by the MSFTI.  Following the

publication of the Preliminary Determination, Changhong claimed

that, in calculating the average values from the MSFTI, Commerce

departed from its long-standing practice of omitting those import

values that were reported either: (1) in small quantities; and/or

(2) at aberrational prices.  *See* Changhong Case Brief at 27-28

("[T]he Department should remove from its import data any

---

    [23]    As has been previously discussed, Commerce valued 25-inch CPTs and Speakers using import data from Infodriveindia. *See* Preliminary Determination, 68 Fed. Reg. at 66,808.

aberrational unit values . . . and should remove . . . any import values that are imported in such small quantities . . . .").  In its Final Determination, Commerce stated that it is not its normal practice to "automatically exclude imports of small quantities of merchandise from the calculation of surrogate values."  *See* Issues & Decision Mem. at 30.  Rather, "the Department's practice is to exclude only data that is deemed to be distortive."  *Id.*  Thus, Commerce agreed that it should remove from its calculations data representing aberrational values, but declined to remove values "merely because certain of the underlying import quantities were small."  *Id.* at 31.  Commerce then re-examined the surrogate value data on the record to determine if any of the values cited by the respondents in their case briefs appeared to be aberrational.  As a result of this examination the Department excluded from its calculations, certain values used in the Preliminary Determination.  *See id.*

With respect to Changhong's small quantities claim, in its Issues and Decision Memorandum, Commerce stated that its practice has not been to exclude all small quantity purchases, but rather "to exclude only data that is deemed distortive." *Id.* at 30.  The Department then points to several determinations illustrating its adherence to this methodology.  *See Id.* at 30 (citing Notice of Final Determination of Sales at Less Than Fair Value Saccharin

From the People's Republic of China, 68 Fed. Reg. 27,530, cmt. 1

(Dep't of Commerce May 20, 2003)); *see also* Issues and Decision

Memorandum for the Administrative Review of Heavy Forged Hand

Tools from the People's Republic of China at Comment 11,

accompanying Heavy Forged Hand Tools from the People's Republic

of China, 66 Fed. Reg. 48,026 (Dep't of Commerce Sept. 17,

2001)(final results).  Indeed, the Court has previously approved

Commerce's established practice "to disregard small-quantity

import data when the per-unit value is substantially different

from the per-unit values of the larger quantity imports of that

product from other countries," and thereby distortive.  *See*

*Shakeproof Assmebly Components Div. Of IL Tool Works, Inc. v.*

*United States*, 23 CIT 479 485, 59 F. Supp. 2d 1354, 1360 (1999)

(citing Heavy Forged Hand Tools, Finished or Unfinished , With or

Without Handles, from the People's Republic of China, Final

Administrative Reviews, 62 Fed. Reg. 11813 (Mar. 13, 1997);

Tapered Roller Bearings and Parts Thereof, Finished or

Unfinished, from Romania, Final Results of Antidumping Duty

Administrative Review, 62 Fed. Reg. 37,194 (July 11, 1997)).

While Changhong asserts that Commerce has a practice of excluding

small quantity purchases from its import data, it has pointed to

nothing to prove its case.  Thus, it is apparent that, despite

plaintiff's arguments, Commerce has not had a longstanding

practice of omitting import values merely because they were the

product of a small quantity of imported goods.


In a related claim, plaintiff challenges Commerce's methodology on the basis that it was internally inconsistent with its policy with respect to actual market economy purchases. *See* Pl.'s Br. at 35. Specifically, Changhong argues that Commerce's inclusion of inputs purchased in small quantities in the calculation of surrogate values is inconsistent with its exclusion of Changhong's actual small-quantity purchases from market economies. *Id.* at 33-35. Commerce insists, however, that there is a distinction between a price obtained from a surrogate country that is used to value a factor of production, and the price actually paid by a NME producer to procure a factor of production from a market economy supplier. Commerce states that it employs a different methodology in each of these determinations, and thus, that its behavior is not internally inconsistent.


As has been previously noted, where Commerce values a factor of production using a surrogate value, it is its practice to disregard only small quantity values, that are aberrational in price. *See generally Luoyang Bearing Corp. v. United States*, 28 CIT __, __ 347 F. Supp. 2d 1326, 1353. Where the Department values a factor of production using actual market economy

purchases, however, its practice is to disregard purchases that are not large enough to be representative of the NME producer's purchases of the input during the POI.  According to defendant, such distinct treatment is reasonable because, with respect to a respondent's market economy purchases, there is greater potential for manipulation of import data by a respondent.  *See* Defendant-Intervenors' Resp. Br. ("Def-Int.'s Resp.") at 34 ("Such a policy is reasonable.  First, as a practical matter, in a market setting, small volume purchases would not generally reflect true commercial values . . . and therefore it is appropriate to disregard these transactions.  These values for small volume purchases of self-selected market economy purchases could be manipulated by respondent.").

The court finds that Commerce's behavior is not internally inconsistent because it is based on separate methodologies, i.e., when seeking a surrogate value, Commerce disregards insignificant purchases that are distortive; when using actual prices paid it excludes small quantity purchases as possible subjects of manipulation.  Moreover, these two separate methodologies are the past practice of the Department, and have each been upheld as such by the Court.  *See Shakeproof Assembly Components Div. Of IL Tool Works Inc., v. United States*, 24 CIT 485, 491, 102 F. Supp. 2d 486, 492 (2000), *aff'd,* 268 F.3d 1376 (Fed. Cir. 2001).

Next, Changhong maintains that even if Commerce is allowed to include small volume imports in its surrogate analysis, it failed to revise fully its surrogates to adjust for all aberrational values.  *See* Pl.'s Br. at 35-37.  Specifically, Changhong objects to the inclusion of "five transformers valued at Rs. 29,000 . . . 20 kilograms of varnish valued at Rs. 29,000" from New Zealand, and "other surrogate values," which it believes are aberrational.  *Id.* at 37.

With respect to this claim, the court finds that because Changhong failed to raise its objection when alleging ministerial errors following the Final Determination it has waived its objection.  *See IPSCO*, 965 F.2d at 1061–62.  Changhong and other respondents specifically complained of Commerce's inclusion of aberrational small-quantity imports following the Preliminary Determination.  Upon reviewing these objections, in its Final Determination, Commerce removed certain aberrational values from its calculation of several surrogate values.  These revisions were published in Attachment 2 of its Final Factors Memorandum, and made available to all parties.  Following the Final Determination, IBEW, TCL Corp., and Konka Group Co. Ltd., made ministerial error allegations concerning calculation of surrogate values, and where appropriate, Commerce corrected these errors.  Changhong too had the opportunity to challenge the inclusion of

these quantities at the administrative level, but made no objection.  Indeed, Changhong itself indicates that it was aware of what it considered to be errors by Commerce following the publication of the revisions.  *See* Pl.'s Br. at 37 ("[A] review of Commerce's revision reveals that . . . Commerce failed to make several required changes to its surrogate values.").

Unlike its claims with respect to Commerce's calculation of financial ratios, here, plaintiff's complaint relates to a ministerial error.  That is, Changhong complains about Commerce's failure to make, what it considers to be, required changes. Thus, is alleges ministerial errors.  The court finds that Changhong failed to avail itself of the opportunity to raise its objection within a reasonable time, and therefore has waived its objections.  *See IPSCO*, 965 F.2d at 1061–62.  Accordingly, the court will not entertain Changhong's claim that Commerce failed to fully revise its surrogates to adjust for all aberrational values.

    E.   Commerce's Valuation of Changhong's Electricity
          Utilization

The court next addresses whether substantial evidence supports Commerce's valuation of electricity.  In its Preliminary Determination, Commerce valued Changhong's electricity utilization based upon data from the International Energy

Agency's Key World Energy Statistics 2002 Report ("IEA Report"),

adjusted[24] for the POI.  *See* Preliminary Factors Valuation Mem.

at 5.  Following the preliminary determination, Changhong placed

on the record, data obtained from the all-India average

electricity rate tariff published by the Power & Energy Division

of the Government of India's Planning Commission ("P&ED Report").

*See* Changhong Jan. 28, 2004 Factor Values Submission at 6.  In

its case brief, Changhong argued that Commerce should rely on the

P&ED Report because it: (1) was an official government source

that has been published on a continuous basis for fourteen years;

(2) covered the fiscal year 2001 through 2002; and (3) had been

relied upon by Commerce in multiple recent administrative reviews

and investigations.  *See* Changhong Case Br. at 29.  In its Final

Determination, Commerce declined to use the P&ED Report average

tariff because it found that "this tariff does not represent the

best information available on the record of this investigation

because it is not an actual consumption rate, but rather is an

estimated or 'AP' (i.e., annual plan) rate."  Issues & Decision

Mem. at 31.  Instead, Commerce based its surrogate value for

electricity on the 2000-01 Revised Estimate average rate ("RE")

for industrial consumption published in the IEA Report.  *See id.*

_____

[24]    Commerce revised the reported price [[


    ]]  *See* Preliminary Factors Valuation Mem. at 5, &
Attachment 7.

Changhong argues that the Department's decision to value electricity based upon the IEA Report, instead of the P&ED Report, was flawed.  *See* Pl.'s Br. at 42-43.  First, Changhong insists that Commerce "failed to take into account deficiencies in the IEA Report," including that its data was not contemporaneous with the POI.  *Id*. at 42, 43 ("Commerce departed from its normal practice by relying upon surrogate factors that are not contemporaneous with the period under review.").

In support of its decision to use the IEA Report, Commerce states that "[t]he Department consulted a World Bank economist with respect to the differences between 'AP' [Annual Plan Rate proposed by Plaintiff] and 'RE' [Revised Estimate].  According to the World Bank economist . . .[the IEA Report] figures tend to be closer to the actuals as they contain adjustments to AP [Annual Plan] figures [found in the P&ED Report] prepared the year before.'" *See* Placement of Information on Record Re: Surrogate Value (Apr. 12, 2004 Surrogate Value for Electricity Mem.) at ¶ IV.  Based on the economist's description, the Department determined that the IEA Report 2000-01 rate was "more reliable" than the P&ED Report 2001-02 rate because it updated the estimated rate with actual usage information.  *See id.*  Thus, Commerce weighed the non-contemporaneity of the IEA Report data against the evidence indicating that its data was more accurate,

and determined that the non-contemporaneity failed to overcome

the evidence that the IEA Report was the best available

information.  *Id.* (citing administrative review of persulfates

from the PRC, for the proposition that the revised estimate were

preferable to the annual plan); *see also* Def.'s Resp. at 37 (IEA

Report data is the best available information "even though the

annual plan [P&ED Report data] was contemporaneous with the

period of review.").


Commerce has pointed to record evidence indicating a greater

accuracy of the data contained in the IEA Report, i.e., that the

data was more accurate because it updated the estimated rate with

actual usage information.  Because the selected information

appears to be more accurate, it cannot be said that Commerce was

unreasonable in choosing it over a more contemporaneous, but less

accurate alternative.


Next, plaintiff maintains that the IEA Report is further

flawed because Commerce "did not abide by its statutory

requirements [in] utiliz[ing] a 'fully-loaded' tax-inclusive

electricity price in calculating normal value for Changhong's

merchandise."  Pl.'s Br. at 43.  Specifically, Changhong contests

the use of the data on the basis that "Commerce failed to note

the fact that the Indian electricity pricing that it collected

from the IEA Report included various taxes and surcharges."  *Id.*


In earlier determinations, Commerce has expressed a preference to use surrogate price data which is . . . tax exclusive.  *See Taiyuan Heavy Mach. Imp. & Exp. Corp. v. United States*, 23 CIT 701, 711 (1999) (not published in the Federal Supplement).  The Court, however, has recognized Commerce's practice to remove sales and excise taxes from its calculation of normal value *only* "when there is an *affirmative indication of their presence*."  *Taiyuan*, 23 CIT at 711 (emphasis added).  To supply this affirmative indication, Changhong states that "[a]ccording to Footnote (g) of the IEA printout, the electricity *for industry pricing* is tax exclusive for only Australia and the United States."  *See* Pl.'s Br. at 43 (citing Preliminary Factors Mem. at Attachment 7) (emphasis added).  An examination of footnote (g), however, reveals no evidence, specific or otherwise, reflecting that the IEA value for electricity is tax exclusive for Australia and the United States.  Rather, any information regarding tax inclusion/exclusion is absent from the cited source.  *See* Prelim. Factors Mem. at Attachment 7 (reflecting data concerning HS Codes, product description, quantity, value, AUV, [average unit value] unit, foreign port and country).  As such, Changhong has failed to point to specific evidence showing an "affirmative indication" that the IEA Report

surrogate values included tax.  Commerce's decision not to deduct taxes from the surrogate values, therefore, is in accordance with law.  *See Taiyuan*, 23 CIT at 711 ("Since plaintiff did not present information about a specific surrogate value containing excise and sales tax, Commerce's decision [not to deduct taxes from its surrogate value] is based on substantial evidence and otherwise is in accordance with law.").  Accordingly, Commerce's surrogate valuation of electricity is sustained.

## II.  Defendant-Intervenors' Challenges

The court next turns to the issues presented for review in one of the consolidated cases, *IBEW v. United States*.  In their complaint, IBEW, IUE-CWA, and Five Rivers LLC, the defendant-intervenors, contest various aspects of Commerce's Final Determination.  *See* Compl. of 07/30/04 ("Def.-Int.'s Compl.").

### A.    Commerce's Negative Critical Circumstances Determination

On October 16, 2003, IBEW alleged that critical circumstances existed.  A finding of critical circumstances pursuant to 19 U.S.C. § 1673b(e), is an emergency measure to "provide prompt relief to domestic industries suffering from large volumes of imports, or a surge over a short period in, imports."  H.R. Rep. No. 96-317 at 63 (1979).  Following its investigation, Commerce published its preliminary affirmative

finding that dumping had occurred, and its preliminary

affirmative determination of critical circumstances.  *See*

Preliminary Determination*,* 68 Fed. Reg. 66,800, 66,808-10.

Because of the affirmative critical circumstances determination,

Commerce ordered Customs to "suspend liquidation of all imports

of subject merchandise from the PRC entered . . . on or after 90

days prior to the date of publication of this notice in the

Federal Register."  *Id.* at 66,810; *see also* 19 U.S.C. §

1673b(e)(2).[25]  Thus, the suspension applied retroactively to

entries made from August 30, 2003 through November 27, 2003.


    In the Final Determination, however, Commerce found that

critical circumstances did not exist and therefore issued a

negative determination on that issue.  *See* Final Determination,

69 Fed. Reg. 20,594.  Commerce then instructed Customs to

terminate the retroactive suspension of liquidation of entries.

Thereafter, defendant-intervenors filed their complaint

contesting the negative critical circumstances determination.

*See* Def.-Int.'s Compl. ¶¶ 9-13.


    On August 30, 2004, defendant-intervenors filed a consent

---

    [25]    Pursuant to § 1673b(e)(2), if Commerce determines that
affirmative critical circumstances exist, Commerce may order a
retroactive suspension of liquidation, applicable to imports of
subject merchandise, made 90 days prior to the publication of the
preliminary determination.

motion for a preliminary injunction to enjoin the liquidation of entries of CTRs produced or exported by Changhong.  Defendant-intervenors did not, however, contemporaneously file a motion for a temporary restraining order ("TRO").  The next day, Changhong[26] and Wal-Mart Stores, Inc. ("Wal-Mart") each filed consent motions to intervene; which motions were granted, respectively, on September 8th and 9th, 2004.  On September 2, 2004 defendant-intervenors filed an amended motion for preliminary injunction, but again made no request for a TRO.  On September 9, 2004, Changhong filed its opposition to the motion for preliminary injunction.  Wal-Mart filed its motion contesting the motion for preliminary injunction on September 14, 2004.  On October 25, 2004, the court, *sua sponte*, issued an order temporarily enjoining Customs from "making or permitting liquidation of any unliquidated entries of certain color television receivers, as defined in the scope of the United States Department of Commerce's antidumping duty order on certain color television receivers from the People's Republic of China . . . entered by Sichuan Changhong Electric Co., from August 30, 2003 through May 31, 2005. . . ."  *See* TRO of 10/25/2004.  On February 11, 2005, following Oral Argument, the court issued a preliminary injunction enjoining Commerce and Customs from "causing or

---

[26]    Changhong's motion was filed prior to the consolidation of the member cases addressed herein.  *See generally* Order of 09/19/2005.

permitting liquidation of the entries" made "on or after August 30, 2003 through May 31, 2005 . . . which remain unliquidated" as of the date of service of the order.  *See*  Prelim. Inj. Order of 02/11/05.

There is controversy, however, as to the effect of the injunction because the United States insists that the entries at issue were deemed liquidated by operation of law, prior to the issuance of either the TRO or the preliminary injunction.  *See* Def.'s Resp. Opp. Pl.'s Mot. J. Ag. Rec. ("Def.'s 04-270 Resp.") at 18.  That is, defendant claims that the suspension of liquidation occasioned by the affirmative preliminary determination of critical circumstances, ceased upon the publication of the negative final determination.  As a result, Commerce contends that on October 16, 2004, six months after the April 16, 2004 Final Determination publication date, the entries were liquidated by operation of law pursuant to 19 U.S.C. § 1504(d), and that the court's October 25, 2004 TRO and February 11, 2005 preliminary injunction had no effect on the already liquidated merchandise.  *See id.* at 18; *see also* Prelim. Inj. Order of 02/11/05.  Thus, the Department contends that defendant-intervenors' challenge to Commerce's negative critical circumstances determination is moot.  *See* Def.'s 04-270 Resp. at 17-19.

Liquidation is the "final computation or ascertainment of the duties . . . accruing on an entry."  19 C.F.R. § 159.1; *see also Juice Farms, Inc. v. United States*, 68 F.3d 1344, 1345-46 (Fed. Cir. 1995).  In most circumstances, Commerce will order Customs to liquidate entries within one year of the date of entry or withdrawal of the subject merchandise.  *See* 19 U.S.C. § 1504(a).  There is, however, a statutory provision specifically directing deemed liquidation (liquidation by operation of law), if certain criteria are met.  *See* 19 U.S.C. § 1504(d).  Section 1504(d) provides that, except in circumstances not relevant here,[27]

> When a suspension [of liquidation] required by statute or court order is removed,[28] the Customs Service shall liquidate the entry . . . within 6 months after receiving notice of the removal from the Department of Commerce . . . .  Any entry . . . not liquidated by the Customs Service within 6 months after receiving such notice shall be treated as having been liquidated at the rate of duty . . . at the time of entry . . . .

19 U.S.C. § 1504(d).  Thus, this section directs the deemed liquidation of unliquidated entries six months after the order

---

[27]     Specifically, "unless liquidation is extended under subsection (b) [the provision allowing for extension by request, for good cause shown, by the importer of record] of this section . . . ."  *See* § 1504(d).

[28]     Pursuant to 19 U.S.C. § 1671d(c)(2)(A), if Commerce's final determination is negative, Commerce must terminate the suspension of liquidation required by § 1671b(d)(2).

suspending liquidation has been removed. *Id.*  For this deemed

liquidation to occur, however, certain criteria must be met: "(1)

the suspension of liquidation that was in place must have been

removed; (2) Customs must have received notice of the removal of

the suspension; and (3) Customs must not liquidate the entry at

issue within six months of receiving such notice." *Koyo Corp. of

U.S.A. v. United States*, 29 CIT __, __, 403 F. Supp. 2d 1305,

1308 (2005) (citing *Fujitsu v. United States*, 283 F.3d 1364, 1376

(Fed. Cir. 2002)).  Pursuant to § 1504, if these criteria are

met, the entry is liquidated at the entered rate six months after

the suspension order is removed.[29]  *See* § 1504(d) (stating that

entries meeting the requirements of this subsection "shall be

treated as having been liquidated at the rate of duty, value,

quantity, and amount of duty asserted at the time of entry by the

importer of record.").

Unsurprisingly, defendant-intervenors disagree with

Commerce's position that the entries were liquidated by operation

of law and that their claims with respect to critical

---

[29]    At oral argument, counsel for defendant-intervenors
argued that if this court finds that the subject entries are
deemed liquidated, the court should, nonetheless, order
liquidation at "the bonding rate of 57 percent."  Oral Arg.
Trans. at 58.  The court finds that, having found the entries to
be deemed liquidated, § 1504(d) clearly directs that the entries
be liquidated at the "rate of duty . . . asserted at the time of
entry by the importer of record."  § 1504(d).

circumstances are moot.  Defendant-intervenors argue that "the court has jurisdiction to hear this claim because the preliminary injunction currently in place prevented liquidation of the entries regardless of whether the liquidation would be through actual liquidation or liquidation by operation of law."  Pl.'s Reply Br. Supp. Pl.'s R. 56.2 Mot. J. Ag. Rec. ("Def.-Int.'s Reply") at 2.  Thus they contend that "the court-ordered injunction prevents the liquidation of these entries regardless of the type of liquidation.  That is, the injunction prevents the actual liquidation of these entries and prevents liquidation of these entries by operation of law."  Def.-Int.'s Reply at 4.  The court finds defendant-intervenors' argument unconvincing.

The TRO issued on October 25, 2004, halted the liquidation of unliquidated entries from that date forward.  In like manner, the preliminary injunction entered on February 11, 2005, by its terms, had no effect on entries liquidated before the date of its issuance.  *See* Prelim. Inj. Order of 02/11/2005 ("This Order applies to any and all of the following entries. (1) Entries . . . that were; (2) entered . . . on or after August 30, 2003 through May 31, 2005; and (3) *remain unliquidated . . .* after the date on which this order is . . . served.") (emphasis added).  This is the case whether liquidation is made by action of the Customs Service or by operation of law.  Because defendant-

intervenors did not make an application for a TRO when they filed
their motion for a preliminary injunction, no order was entered
to stop the impending deemed liquidation.  Therefore, on October
16, 2004, pursuant to § 1504(d), the entries were deemed
liquidated – not by some action of the Customs Service, but
rather by statute.[30]  *See Gerdau Ameristeel Corp. v. United
States*, 30 CIT __, __, __ F. Supp. 2d  __, __, slip. op. 04-00608
at 4 (August 10, 2006) (finding that "without an injunction
[covering the unliquidated entries] liquidation means an
interested party will forever lose its statutory right to
challenge an administrative review.") (internal citations and
quotations omitted).

The preliminary injunction, upon which defendant-intervenors
rely, cannot undo the deemed liquidation of the subject entries.
Once liquidation occurs, it moots the underlying agency decision
because "the statutory scheme does not authorize this court to

---

[30]    The TRO enjoining liquidation was not issued until
after the expiration of this date, i.e., on October 25, 2004, and
was entered *sua sponte*.  *See* TRO.  This TRO was a measure taken
by the court, and covered all "unliquidated" entries.  *Id.*  At
the time of issuance, however, the entries at issue here had been
liquidated by operation of law, and thus were outside the purview
of the order.

Although the entries are deemed liquidated by operation of
law as of October 16, 2004, pursuant to the preliminary
injunction, the United States has not performed the ministerial
functions related to that liquidation.  Nonetheless, the entries
have been deemed liquidated.

order a reliquidation of entries once they are liquidated . . .

." *Chr. Bjelland Seafoods A/S v. United States*, 19 CIT 35, 46

slip. op. 95-5 (Jan. 18 1995)(not published in the Federal

Supplement).  Indeed, "the statutory scheme has no provision

permitting reliquidation and once liquidation occurs, a

subsequent decision by the trial court on the merits . . . can

have no effect on the dumping duties assessed on [subject]

entries." *Mitsubishi Elecs. Am. v. United States*, 18 CIT 167,

180, 848 F. Supp. 193, 203 (1994)(citing *Zenith Radio Corp. v.

United States*, 710 F.2d 806, 810 (Fed. Cir. 1983))(internal

quotations omitted).


In the instant matter, the entries at issue meet the

requirements of § 1504(d) and therefore, were liquidated by

operation of law.  The April 16, 2004 publication of Commerce's

negative final determination removed the suspension of

liquidation resulting from the preliminary affirmative

determination.  *See* Final Determination 69 Fed. Reg. at 20,597

("[B]ecause we find that critical circumstances do not exist . .

. we will instruct the CBP [Customs & Border Protection] to

terminate the retroactive suspension of liquidation . . .

instituted due to the preliminary affirmative critical

circumstances finding."); *see also Int'l Trading Co v. United

States*, 412 F.3d 1303, 1308 (Fed. Cir. 2005) ("[t]he date of

publication provides an unambiguous and public starting point for the six-month liquidation period . . . .").  During this six-month period, Customs did not liquidate the entries at issue.  Accordingly, this court finds that the entries at issue were liquidated by operation of law on October 16, 2004, six months from the date of publication of the notice of removal of the suspension of liquidation order.

Because of this deemed liquidation, the court concludes that any dispute over Commerce's negative critical circumstances determination is moot.  *See Gerdau Ameristeel*, 30 CIT at __, __ F. Supp. 2d at  __, slip. op. 04-00608 at 2 (Aug. 10, 2006) ("Because all of the subject entries at issue have been liquidated this Court lacks jurisdiction to hear this matter.").  Mootness has been described as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness)."  *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (internal quotations and citations omitted).  "Simply stated, a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Powell v. McCormack,* 395 U.S. 486, 496 (1969) (internal quotation marks omitted).

This Court has held that "liquidation renders moot any

pending court challenge to the underlying agency determinations regarding those entries . . . ." *Chr. Bjelland Seafoods*, 19 CIT at 46.  It has long been settled that a federal court has no authority "to give opinions upon moot questions . . . ." *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992); *see also Mills v. Green*, 159 U.S. 651, 653 (1895).  Accordingly, defendant-intervenors' challenge to Commerce's negative critical circumstances determination in its Final Determination is dismissed as moot.

B.   Valuation of 29-inch CPTs

In its Preliminary Determination, Commerce valued Changhong's production of 29-inch CPTs using import data reported on Infodriveindia.  *See* Preliminary Determination, 68 Fed. Reg. 66,808.  In its Final Determination, however, Commerce found that it was no longer appropriate to value CPTs using this data based on its examination of information relating to Changhong's market economy purchases of CPT's.  *See* Issues & Decision Mem. at 52, 56.  At verification, Commerce confirmed that Changhong purchased a significant quantity of CPTs from Mexico, a market economy country, approximately three weeks after the POI.  Thus, in the Final Determination, Commerce valued the 29-inch CPTs using Changhong's market economy purchases.  *Id.* at 56.

Defendant-intervenors contend that in the Final

Determination, the "Department inexplicably amended the value

assigned to Changhong's consumption of 29-inch, curved color

picture tubes in the preliminary determination.  *See* Def.-Int.'s

Mem. at 28.  They argue that the Department committed error in

relying on post-POI purchases and, in doing so, deviated from

"Commerce's longstanding policy of not relying on . . . purchases

. . . that occur outside of the POI.[31]  *Id.*

Plaintiffs' contentions are without merit.  First, unlike

Changhong's claims concerning contemporaneity, *infra*, here there

is no question as to the actual dates of the transactions.  In

---

[31]     In its reply, defendant-intervenors contend that the
"Department has an established practice of not relying on an NME
producer's purchases from market economy suppliers that occur
outside of the POI . . . ."  Def.-Int.'s Reply at 16.  Although
defendant-intervenors maintain that Commerce "has discussed this
approach and applied it in numerous cases," they point to only
one example: Certain Automotive Replacement Glass Windshields
from the People's Republic of China, 67 Fed. Reg. 6482, 6485
(Dep't Commerce Feb. 12, 2002)(final determination).  *Id.*  This
determination is not on point.  Although, in that investigation,
Commerce indicated that "consistent with its practice," it would
continue not to use market economy inputs "if they are
insignificant or purchased outside of the period of
investigation" the matter itself did not involve pre- or post-POI
inputs.  67 Fed. Reg. at 6485.  Instead, the issue there was
whether the purchase of market economy inputs was "meaningful."
*See e.g., Shakeproof Assembly Components Div. of Ill. Tool Works
Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001)
(recognizing that the "factors of production for domestically
purchased merchandise may be obtained by extrapolating the market
economy import price only when a 'meaningful amount of
merchandise is imported.").

addition, while preferring information that is contemporaneous with the POI, Commerce also has a longstanding preference for using prices paid by NME producers for inputs purchased from a market economy country.  *See* Sparklers from the People's Republic of China, 56 Fed. Reg. 20,588, 20,590 (ITA May 6, 1991)(final determination)(listing in preferential order, information used to value factors of production in NME cases: "(1) prices paid by the NME manufacturer for items imported from a market economy; (2) prices in the primary surrogate country of domestically produces or imported materials . . . ."); *see also Oscillating Fans and Ceiling Fans from the People's Republic of China*, 56 Fed. Reg. 55,271 (1991) (final determination) ("Where an input was sourced from a market economy country and paid for in a market economy currency, we have used the actual price paid for the input in calculating FMV.").  Indeed, when valuing factors of production in an NME country, like China, "[t]he cost for raw materials from a market economy supplier, paid in convertible currencies, provides Commerce with the closest approximation of the cost of producing the goods in a market economy country."  *Lasko Metal Prods. v. United States*, 16 CIT 1079, 1081, 810 F. Supp. 314, 317 (1992).

In determining which value to base its final determination upon, Commerce had two options: (1) value factors of production

using surrogate import values during the POI; or (2) value
factors based upon actual market economy purchases made by
respondent approximately three weeks outside of the POI.  In its
Issues and Decision Memorandum, Commerce explained why it no
longer found it appropriate to base the value for 29-inch CPT's
on data from Infodriveindia.  *See* Issues & Decision Mem. at 56.
Commerce indicated that "at verification we examined information
related to Changhong's market-economy purchases of this input
from Thomson Mexico."  *Id.*  As a result, the Department
determined that the market economy purchases represented "a
significant quantity of Changhong's overall purchases of this
input, and thus found that they were significant" and
consequently "meaningful" as is required by law, and the
Department's practice.  *See* Issues and Decision Mem. at 56*;
accord Shakeproof,* 268 F3d at 1382*.*  Thus, Commerce took into
account the circumstances of the purchases, i.e.,: (1) the volume
of the purchase; (2) that the supplier was a market economy
entity; and (3) that the purchase was in market economy currency.
*See id.* at 55.  Given Commerce's justifiable preference for
market economy purchases, it determined that these aspects
overcame the fact that purchases were modestly outside of the
POI.

It is apparent that no fault can be found with the
Department's choice of market prices when valuing 29-inch CPTs.

Commerce properly preferred the post-POI, market economy purchases over NME import data within the POI.  That these purchases were slightly outside the POI cannot be said to materially diminish their reliability.


## CONCLUSION

In accordance with the foregoing, the court sustains in part, and remands in part, Commerce's Final Results.  Commerce's remand results are due on December 13, 2006, comments are due on January 12, 2007, and replies to such comments are due on January 23, 2007.

                                    /s/ Richard K. Eaton
                                  Richard K. Eaton, Judge



Dated:     September 14, 2006
           New York, New York